No. 46,218

THE STATE OF KANSAS, on the Relation of ROBERT C. LONDERHOLM, Successor in Office to WILLIAM M. FERGUSON, Attorney General of The State of Kansas, and KEITH SANBORN, County Attorney of Sedgwick County, Kansas; and BOARD OF EXAMINERS IN OPTOMETRY FOR THE STATE OF KANSAS, *Appellants*, v. CHARLES E. DOOLIN and LOREN B. SHAW, Doing Business as DOOLIN-SHAW OPTICAL DISPENSERS, and GEORGE S. WALLACE, *Appellees*, THE KANSAS MEDICAL SOCIETY, a Corporation, *Appellee*.

(497 P. 2d 138)

Opinion filed May 6, 1972.

*Glenn J. Shanahan,* Special Assistant Attorney General, of Wichita, argued the cause, and *Wendell L. Garlinghouse,* Special Assistant Attorney General, of Topeka, was with him on the brief for the appellants.

*Joseph W. Kennedy*, of Morris, Laing, Evans & Brock, Chartered, of Wichita, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

OWSLEY, J.: This is an action brought by the State of Kansas and the Board of Examiners in Optometry against Charles E. Doolin and Loren B. Shaw doing business as Doolin-Shaw Optical Dispensers and George S. Wallace, their employee, seeking a permanent injunction and ouster on account of defendants' fitting contact lenses under direction of licensed physicians, which was alleged to be violative of the optometry law of the State of Kansas. The defendants prevailed and the plaintiffs appeal.

The petition in this case was filed on March 4, 1964, and alleged in substance that the defendants were violating the optometry law of the State of Kansas (K. S. A. 65-1501, *et seq.*) by the unlawful practice of optometry. The unlawful practice of optometry was said to consist of: (*a*) the examination and testing of the human eye with and without the use of drugs and medicine to ascertain the presence of defects or abnormal conditions which can be corrected by the use of lenses; (*b*) the adaptation and fitting of lenses to the human eye; and (*c*) the furnishing of optometrical services and the holding out by them of an office where optometrical services are furnished.

The petition charged defendants with being "common and public nuisances to the State of Kansas and the various vicinities and neighborhoods thereof" and sought a permanent injunction against the defendants from unlawfully engaging in the practice of optometry within the State of Kansas. Upon motion by defendants, the Board of Examiners in Optometry for the State of Kansas was held to be an indispensable party to the action and was thereafter added as an additional party plaintiff.

The defendants timely filed their answer denying the allegations of the petition and also filed a counterclaim in which the right and authority of the optometrists under the optometry law of Kansas to prescribe and fit contact lenses, without first obtaining a written prescription therefor from a duly licensed physician, was questioned.

On or about April 1, 1966, the Kansas Medical Society, upon proper motion, was allowed to intervene as a defendant in the case and to file pleadings. The Kansas Medical Society adopted by reference the answer and counterclaim of the defendants and further

charged that the prescription of contact lenses by optometrists was a violation of the Healing Arts Act of the State of Kansas. (K. S. A. 65-2801, *et seq.*)

Trial to the court commenced on October 2, 1967, and consumed eleven days terminating on October 17, 1967. Thereafter the parties submitted lengthy requests for findings of fact and conclusions of law. On August 15, 1968, the court entered its memorandum opinion including 82 findings of fact and 35 conclusions of law. The court found generally for defendants and against plaintiffs on the main action and against the defendants and for the plaintiffs on the defendants' counterclaim.

Although defendants perfected their cross-appeal, it has now been abandoned.

Generally, the development of the contact lens has proceeded from the use of glass to plastic, and has proceeded from a lens covering the entire sclera to one covering the cornea only. After the development of the corneal lens the diameter and the thickness of the lens were both reduced to make a much lighter, thinner lens which could be worn with comfort by the average contact lens patient. After the development of the microlens in 1954 the use of contact lenses quickly gained wide acceptance and use by the general public.

For many years optical dispensers were known as "opticians" and usually confined their activities to the grinding of lenses and the fitting of spectacles to the human eye upon prescription of a physician. In the latter part of the nineteenth century some of these dispensing opticians took upon themselves the additional responsibility and function of refracting human eyes to determine the amount of power correction needed by the patient. Until that time it had been assumed that the refraction of human eyes was exclusively a medical responsibility. Thus, opticians in the latter part of the nineteenth century were divided into "dispensing opticians" and "refracting opticians."

As the "refracting opticians" extended their sphere of influence they successfully obtained legislation in various states recognizing their right to examine eyes for the purpose of determining refractive error. Around the turn of the century the "refracting opticians" took upon themselves the name of "optometrists" and in 1904 formed the American Optical Association. This in turn became the American Optometric Association in 1918.

Meanwhile, the "dispensing opticians" continued their historic functions of grinding lenses and fitting spectacles to the eyes of patients referred to them by both medical doctors and "refracting opticians." As the field of human eye care became more and more complex and thus more specialized, the dispensing opticians secured licensing legislation in several states in the early to middle part of the twentieth century. Kansas does not have a licensing statute regulating the practice of dispensing opticians.

As the optometry laws developed in the United States, it was generally recognized that dispensing opticians could, without license, maintain their historic function of grinding and dispensing lenses. This is evident in the optometry law passed in the State of Kansas in 1923 which allows the dispensing optician to dispense ophthalmic lenses upon the prescription of an optometrist or other person legally qualified to prescribe ophthalmic lenses. (K. S. A. 65-1504b.)

Defendants are unlicensed dispensing opticians and have been engaged in that business since 1947. Prior to that time both Mr. Doolin and Mr. Shaw had years of experience as opticians with the American Optical Company. In 1947 they established their own optical dispensing company and have been in business continuously since that date.

In the year 1958 when contact lenses were first becoming popular in the State of Kansas, defendants were requested to commence the service of contact lens fitting by the ophthalmologists and medical doctors for whom they filled prescriptions. In preparation for this service each of the defendants attended a special contact lens fitting course given by Precision-Cosmet Company in Minneapolis, Minnesota. At this course defendants were taught the use of the keratometer and trial contact lenses. Upon their return they conferred and consulted with ophthalmologists practicing in Wichita, Kansas, determined the techniques and procedures which they should use in the fitting of contact lenses and adopted, at the suggestion of the ophthalmologists, certain wearing schedules and other procedures necessary to fit contact lenses completely and adequately.

Shortly after defendants' entry into the business of fitting contact lenses the Kansas Optometric Association, in 1959, began an investigation of defendants to determine whether or not they were practicing optometry. The association authorized its attorneys (who are the present counsel for the plaintiffs) to take whatever steps were necessary to investigate these activities, and to bring suit against

any person thought to be violating the optometry law. As a result of this directive the association hired several witnesses to visit the offices of defendants to obtain contact lenses from them after first receiving a prescription for the lenses from a qualified medical doctor.

A composite of the testimony of the defendants Shaw and Wallace as to each step in the fitting process is as follows:

Doolin and Shaw and their employee Wallace begin the process of fitting contact lenses by receiving a printed form (Plaintiffs' Exhibit No. 1) signed by a physician. On this form is a statement there are no contraindications to the wearing of contact lenses by the customer and there is a direction to Doolin and Shaw to proceed with technical measurements and return the patient to the doctor for verification of all details. The information on the form consists of that required for a spectacle lens prescription.

At the first visit, the customer meets with Doolin and Shaw for about one hour. An explanation of how the lenses are fit, with simple drawings used to illustrate the eye, is given to the customer. The fitting program is described so the customer knows the number of visits there will be before he takes the lenses home; also, checks made at different periods are explained. Next, an instrument called a keratometer is used to make measurements of the curvature of the cornea of the eye. Two readings are taken for each eye to try to arrive at the same figure. This measures the front center of the cornea and is accomplished by light reflection to focus on a series of targets inside the keratometer. This information is written on a work sheet and constitutes a starting place for selection of a trial diagnostic lens. This reading helps to determine the curvature of the diagnostic lens. Other measurements are made and the tenseness or looseness of the lids is assessed. On the basis of these observations, the trial lens is selected which approximates the curvature of the eye and the fitting process begins. The lens is selected from the trial fitting sets owned by Doolin and Shaw. The trial lens is inserted into one eye. Ideally, it should float over the cornea on a layer of tears without touching. To determine whether or not the lens is touching the cornea, fluorescein dye is introduced into the eye with a strip of paper moistened with an eye irrigating solution and impregnated with fluorescein at one end. The fluorescein mixes with tears in the eye and is activated when viewed under an ultraviolet or black light. In this manner, the tears can be viewed under the lens to determine if the lens is touch-

ing the cornea or floating over it as it should. The layer of tears under the lens is called the tear lens or lacrimal lens. The resulting fluorescein pattern in this test affects the determination of the base or fitting curve of the lenses ultimately selected or ordered. At this time Doolin and Shaw inform their customer whether or not he might be able to accept and adjust to contact lenses, and the customer makes a choice as to whether he wishes to start the program and order lenses from the manufacturer. If he decides to wear contact lenses, he is advised that he will be called later when the lenses are received from the manufacturer's laboratory.

Using information from the prescription form and work sheet, the order (Plaintiffs' Exhibit No. 2) to the manufacturer is made. A verification of all specifications is made when the lenses are received as to the diameter, base curve, width of the intermediate curve, width of the peripheral curve, the power, and the quality of the lenses overall. In the order, Doolin and Shaw have determined the base or fitting curve through use of the keratometer and the fluorescein pattern test; the power of the lens from the prescription is determined through use of a conversion table which converts spectacle lens power to contact lens power; the intermediate and peripheral curves are generally ordered from a chart; the diameter is specified as a result of their measurement of the iris. At this time three so-called delivery appointments are arranged on three consecutive days for about one hour each day.

On the first delivery appointment, the lenses are applied to the eye and the customer is advised that this is a conditioning period. He is asked to remain in a fitting room for about one hour. Periodic checks are made to see whether the lenses are remaining in place and are comfortable. Near the end of the period, if excessive tearing is not present, a fluorescein pattern test is made to check for proper fit. It also reveals any disturbance on the cornea caused by rubbing or abrasiveness of the lens. In case of touch on the cornea, the lens is altered at this time or it is decided that new lenses are to be ordered. Changes in diameter, secondary curve, or peripheral curve are made in Doolin and Shaw's office.

At the second visit, on the next day, the customer is instructed in the handling procedure of his lenses. He practices putting them on the eye, removing them, and cleaning or preparing them. Visual assessment of the fit while the lens is on the eye is made and if needed a fluorescein pattern test is used. Sometimes the lenses are

modified. At the end of this visit Doolin and Shaw still have not delivered the lenses to the customer.

The third delivery visit follows on the next day. Doolin and Shaw check the proficiency of their customer in the handling, insertion, removal, and moving of the lens from the white of the eye to the cornea. Many instructions are given at this time, plus distribution of lens care paraphernalia such as the soaking case, soaking solution, wetting solution, and a case to contain small bottles of soaking and wetting solution. Doolin and Shaw deliver the lenses to the customer if they are satisfied with his proficiency in handling them. If not, Doolin and Shaw keep the lenses. A printed wearing schedule furnished by the lens manufacturer is given to the customer. Doolin and Shaw fill in the number of hours per day that the lenses are to be worn during the first one-week wearing period. A general rule of thumb the doctors ask to be followed is that no patient should wear the lenses more than eight hours per day. During the first week Doolin and Shaw generally allow progression from two hours daily to three hours daily. The importance of returning for an appointment after the first week is stressed and the time is set for that appointment.

When the person being fitted comes back at the end of the first week's wearing schedule, he is in the office of Doolin and Shaw for approximately thirty minutes. If he comes in with the lenses on, a fluorescein pattern test is attempted. The same test is also performed with the lens off the cornea. Doolin and Shaw look for marks or indications of marks. Recognized types of marks are stippling, dimpling and abrasion. When there, is an abrasion, the customer is told not to wear the lenses for about 24 to 48 hours as the cornea is a quick healing body tissue and can generally recover within that length of time. Doolin and Shaw make an independent determination as to whether or not to send the patient back to his doctor when there is an abrasion. If that person is told to refrain from wearing the lenses for a time, he is asked to return with the lenses on and the abrasion is assessed with a fluorescein and black light test. If stippling or dimpling is seen at the end of the first week, generally new lenses are ordered. If no marks are seen during this visit Doolin and Shaw conclude their check with solicitation of subjective symptoms and complaints from their customer. Many times modifications are made in the lenses, which change the power through a change in the thickness of the tear lens next to the cornea.

The individual is advised that his vision may not meet prescription standards and that Doolin and Shaw are concerned only with the proper fit on the cornea of the eye. The doctor checks the power with the lenses on after the fitting process. A power change can then be made. Another appointment is made for one week later, at the end of the second one-week wearing schedule.

During the second week of scheduled wearing, the customer tries to progress from three and five hour wearing periods to continuous seven hour times daily. If necessary, the customer may come in sooner as he could during the first scheduled week of wearing, to solve problems of excess tearing, light sensitivity, or feelings of hotness or itchiness in his eyes, and other complaints. If none develop, an examination of the lens fit is made at the pre-set appointment which concludes the second week. An inspection is made with the lens removed for stippling, dimpling or abrasion. Modifications are then made to improve tear flow under the lens. If no modifications are necessary and no problems have developed at the end of the second week of wearing time, the eye physician is called to make a final check of his patient. The appointment is made so the doctor can check the lenses at the end of a full wearing period. If Doolin and Shaw do not feel the fit is quite satisfactory or that maximum wearing time has been achieved the patient receives a new three-week schedule so maximum times of up to eight hours can be reached. The patient must return to Doolin and Shaw after that time before proceeding to the doctor for a final check.

When a customer returns after wearing his lenses for three weeks, Doolin and Shaw follow the same procedures as they do at the end of the other weekly periods. If they are not satisfied with the fluorescein pattern test at that time, they may require the lenses to be worn a little longer before seeing the physician. The early part of the three-week period is the time when problems are most likely to develop. This visit concludes a five-week adaptation period which is the normal time for a person first learning to wear contact lenses. Individuals vary and, if observations indicate it, changes are made to make a proper fit. The person is seen until, in Doolin and Shaw's opinion, the fit is correct; then he goes to his doctor for the final check.

One more check is made after five months. This is done after the customer has had the final doctor check.

The trial court made 117 specific findings of fact, included within 82 numbered paragraphs and subparagraphs. The plaintiffs have raised an issue with regard to approximately 20 of the court's findings, claiming they were erroneously made as not being based on substantial competent evidence. The findings of fact objected to are summarized as follows:

In connection with the contact lens fitting procedure, the court found that the refractive power of a contact lens is determined by converting spectacle power provided by a physician into contact lens power by use of standardized charts and formulae; that defendants were sufficiently skilled to distinguish between normal and abnormal adaptive symptoms and between corneal marks caused by a contact lens itself and marks caused by foreign objects; that defendants' function is to provide comfortably fitting contact lenses and that they are merely technicians who fit contact lenses as the agent of a referring physician according to his direction. The court also found that none of the following acts require professional medical or optometric knowledge, training or judgment or a professional knowledge of physiology, anatomy or pathology; nor do they constitute an examination of the eye to ascertain the presence or absence of defects or abnormal conditions which can be corrected by the use of lenses, prisms or ocular exercises; nor do they constitute in any manner a test or examination of the eye of another to ascertain the refractive muscular or refractive pathological condition thereof:

(*a*) The use of a keratometer to obtain a measurement of the corneal surface of the human eye.

(*b*) The use of fluorescein and black light to ascertain the fit of a contact lens to the human eye.

(*c*) The use of a trial lens as an aid in determining the proper fit of a contact lens to the human eye.

(*d*) The measurement of the palpebral fissure or lid opening, the visible iris diameter, the pupillary size and tension of the lids.

(*e*) The conversion of spectacle lens power into contact lens power by the use of standardized charts and formulae.

(*f*) The teaching of insertion and removal of contact lenses.

(*g*) The teaching of hygienic practices in the use of contact lenses.

(*h*) The furnishing of wearing schedules.

(*i*) The modification of a wearing schedule by reducing the wearing time of the contact lenses.

( *j* ) The modification of a contact lens by changing the peripheral curves thereof.

( *k* ) The modification of a contact lens by changing the diameter of the contact lens.

( *l* ) The elicitation of subjective symptoms of a contact lens customer to ascertain the fit of the contact lens.

The court also found that the acts, procedures, or things done by the defendants do not constitute measuring the refractive power of vision and do not constitute the adaptation of lenses to the human eye. The so-called "lacrimal lens" does not have practical significance in regard to refractive power because it changes constantly as the contact lens moves on the cornea of the eye, and the defendants do not consider any possible refractive power generated by the lacrimal lens. Contact lens fitting is a technical and time-consuming job and there are few medical indications for the wearing of contact lenses. Most contact lenses are prescribed for cosmetic purposes, and thus the physician would not fit contact lenses because his training, experience and time could be better utilized for the treatment of other eye problems. The defendants are technicians engaged in the business of fabricating, fitting, and supplying optical appliances to the wearers thereof and the final determination of the acceptability of optical appliances supplied by the defendants rests with a physician or optometrist. The defendants are opticians and as such are not a licensed profession in Kansas.

George F. Gsell, M. D., testified:

". . . I'm certified by the American Board of Ophthalmology . . . I am the present president of Kansas Medical Society. I have engaged in practice of ophthalmology 32 years in Wichita.

"I prescribe contact lenses and refer patients to Doolin-Shaw Optical Dispensers for fitting procedure. . . .

. . . . . . . . . . . . .

". . . I put on the lens prescription their refraction and vertex distance, and state it is permissible to go ahead and do the technical aspects of fitting . . . Plaintiffs' Exhibit I is form which constitutes my contact lens prescription. The patient is referred to Doolin-Shaw Optical Dispensers for the fitting procedures.

"I know generally the practice or procedures by Doolin and Shaw in the contact lens fitting process . . . They take a keratometer reading and certain measurements of the corneal diameter. They observe the eye. They may or may not put a trial lens on at that time to determine approximate fit. From keratometer readings they may order a preliminary lens, which is received and placed on the patients. They instruct the patient how to insert and remove the lens, explaining the normal sensation the patient will experience. They may

instill fluorescein and examine the staining pattern with a light with a blue filter. It may be necessary to modify that particular lens to fit that particular cornea. They may modify that lens by grinding peripheral curves, which is nothing more than smoothing out a lens so it approximates a fit on the cornea. They have the patient wear the lens for a certain length of time, then check for symptoms and how the patient is doing. If the patient seems to be doing well and is comfortable, they have a more or less regular schedule of wearing times they peremit the patients to do. Depending upon how the patient gets along, they may modify that lens and may get another lens. When they finally have a lens which the patient seems to be wearing uncomfortably for a scheduled period of time, they refer that patient back to me. A great percentage of the time they make the appointment for the patient.

  ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·

"In my opinion, the use of the keratometer to obtain the curvature of the cornea and the measurement of the palpebral fissure, the visible iris diameter, the pupillary size, or the lid tension, does not require a professional medical or optometric judgment, training or knowledge or a professional knowledge of anatomy, physiology or pathology, and does not constitute an examination of the eye to ascertain the presence or absence of defects or abnormal conditions which can be corrected by the use of lenses, prisms or ocular exercises, and does not constitute in any manner a test or examination of the eye of another to ascertain the refractive muscular or pathological condition thereof.

  ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·

"In my opinion, the use of fluorescein, black light and trial contact lens for that purpose, and the use of certain conversion procedures in converting spectacle lens power to contact lens power, does not require a professional medical or optometric judgment or training or a professional knowledge of anatomy, physiology or pathology; and does not constitute an examination of the eye to ascertain the presence or absence of defects or abnormal conditions which can be corrected by the use of lenses, prisms or ocular exercises; and does not constitute in any manner a test or examination of the eye of another to ascertain the refractive muscular or pathological condition thereof.

  ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·

"During the fitting procedure, modifications to the lenses might be made by Doolin and Shaw. They teach the patient the insertion and removal of the lenses and the care and handling of the lenses. In my opinion these things do not require a professional medical or optometric knowledge, judgment or training or a professional knowledge of anatomy, physiology or pathology, and do not constitute an examination of the eye to ascertain the presence or absence of defects or abnormal conditions which can be corrected by the use of lenses, prisms or ocular exercises, and do not constitute in any manner a test or examination of the eye of another to ascertain the refractive muscular or pathological condition thereof.

  ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·

"If a patient comes to Doolin and Shaw with a slight abrasion caused by the contact lens, the patient is advised to remove the contact lens for 24 hours

and return, whereupon a check is made; and if a stain or abrasion is still there, the person is referred to the doctor.

". . . In my opinion, the fitter of the contact lens should not consider the power of the lacrimal lens during the adaptive phase. The lacrimal lens changes frequently during an adaptive period because all factors are changing.

"During the entire fitting procedure, whether a patient is in my presence or whether he is being fitted for contact lenses by Doolin and Shaw outside of my presence, I consider that patient to be my responsibility. . . .

". . . In my opinion, Doolin and Shaw are qualified to determine the difference between the abnormal and normal conditions. They have had a lot of experience. Doolin and Shaw are competent and qualified fitters of contact lenses. . . ."

The testimony of George F. Gsell, M. D., to the extent it covers the same factual considerations, is supported by the testimony of Albert N. Lemoine, Jr., M. D., Donald O. Howard, M. D., R. D. Weaverling, O. D., Wendell D. Waldie, O. D., and Lloyd P. Warren, M. D. We have carefully examined the testimony of each of these doctors and have no hesitancy in holding that the findings of the trial court were supported by substantial competent evidence.

The plaintiffs complain that the court erred in failing to make findings of fact as requested by them. We have held that a trial court's failure to make requested findings of fact is of no concern to this court if the findings which were made support the judgment as stated in *In re Estate of Pyke*, 199 Kan. 1, 427 P. 2d 67, where the court said:

". . . In reviewing findings of fact of a district court and its refusal to make requested findings, this court does not weigh the evidence and is concerned only with the question whether the findings made are sufficient to support the judgment, and whether there is substantial evidence to support the findings made; it is not concerned with evidence which, if believed, would support contrary findings. (Citing cases.) If, upon review of the record, there is substantial competent evidence to support the findings of the district court, it is beyond the province of this court to disturb the judgment on appeal. . . ." (p. 7.)

We have held on many occasions that the findings made by a trial court will not be disturbed on appeal if they are supported by substantial evidence. (*Wiley v. Board of Education*, 205 Kan. 585, 470 P. 2d 792.)

The plaintiffs also complain that the trial court erred in admitting certain testimony concerning defendants' qualifications and skill in the fitting of contact lenses. None of the testimony in evidence by

plaintiffs was objected to at the trial. Plaintiffs are barred from asserting this point as a grounds for reversal on appeal by virtue of the contemporaneous objection rule. (*Jensen v. Jensen,* 205 Kan. 465, 470 P. 2d 829.) See K. S. A. 60-404.

Having concluded that the trial court's findings of fact are supported by substantial evidence, we turn to the question of whether or not defendants' acts, in the fitting of contact lenses, constitute the practice of optometry under the laws of this state. In making this determination we are bound by the findings of fact of the trial court, but we may also consider the testimony of defendant Shaw and defendant Wallace, as to their procedural steps in the fitting of contact lenses.

The trial court made thirty-five conclusions of law, the most important being finding No. 21, which reads:

"The fitting of contact lenses with predetermined optical characteristics, as performed by the defendants, does not constitute the practice of optometry."

and finding No. 23, which reads:

"The defendants, Doolin, Shaw and Wallace, in the fitting of contact lenses, are operating in the capacity of technicians under the supervision and direction of qualified physicians licensed under the Healing Arts Act and their services are performed under the supervision and by order of or referral from such physicians within the meaning of the provisions of K. S. A. 65-2872 (*g*)."

K. S. A. 65-1501 (L. 1923, ch. 220, § 1), defines the practice of optometry as follows:

". . . The examination of the human eye without the use of drugs, medicines or surgery, to ascertain the presence of defects or abnormal conditions which can be corrected by the use of lenses, prisms, or ocular exercises and their adaptation for the aid thereof."

K. S. A. 65-1502 (L. 1923, ch. 220, § 2), defines persons deemed to be practitioners of optometry as follows:

"That any person shall be deemed to be practicing optometry within the meaning of this act, who shall in any manner, except as in section 12 [65-1508] of this act; *first,* display any sign, circular, advertisement or device purporting or offering to in any manner examine eyes, test eyes, fit glasses, or setting himself or herself forth as an optometrist, optician, specialist, eyesight specialist, or refractionist, with intent to induce people to patronize himself, herself or any other person; *second,* who shall make in any manner a test or examination of the eye or eyes of another to ascertain the refractive muscular or pathological conditions thereof; *third,* who shall in any manner adapt lenses to the human eye for any purpose, either directly or indirectly."

K. S. A. 65-1504b (L. 1939, ch. 240, § 6), states:

"It shall be unlawful for any person to dispense an ophthalmic lense or lenses without first having obtained a prescription or order therefor from a duly licensed optometrist, or other person legally permitted to test eyes and fit glasses."

K. S. A. 65-1508 (L. 1939, ch. 240, § 3), states:

"Nothing in this act shall be construed to prevent regular physicians and surgeons who are registered with the Kansas state board of medical examination and registration, from testing eyes and fitting glasses."

K. S. A. 65-2872 (L. 1957, ch. 343, § 72), states:

"The practice of the healing arts shall not be construed to include the following classes or persons: . . .

"(g) Persons whose professional services are performed under the supervision or by order of or referral from a practitioner who is licensed under this act."

K. S. A. 65-2887 (L. 1957, ch. 343, § 87), provides:

"Nothing in this act shall be construed to authorize any person licensed under this act to knowingly perform any act which in any way assists an unlicensed person, firm, association or corporation (a) to make an examination of the eyes for the prescription of glasses, or (b) to perform any of the practice acts for which optometrists are licensed."

The optometry statutes are a recognition that the practice of optometry is a privilege and is not a natural right of individuals. The optometry law was deemed necessary by the legislature, in the interest of public health, safety, and welfare to provide statutes concerning the granting of that privilege and its use, control, and regulation to the end that the public should be properly protected against unprofessional, unauthorized and unqualified practice of optometry.

There has been no helpful judicial interpretation of our optometry statutes. Decisions in other states are limited. In *State Board of Optometry v. Chester*, 251 Miss. 250, 169 So. 2d 468, the defendant was an unlicensed optician. The plaintiff was seeking to enjoin him from the unlawful practice of optometry in fitting and adapting contact lenses, with or without a prescription from a physician. The court held:

"As long as dispensing optician fabricates, fits, and inserts contact lenses in eyes in accordance with prescriptions of examining optometrist, ophthalmologist, oculist or physician, and requires patient to return to examining physician in order that writer of prescription may determine whether or not prescription

has been properly filled and contact lenses properly measured and fitted, optician is not engaged in practice of optometry.

"As long as optician did what under prescription amounted to no more than mechanical adjustment and fitting of contact lenses under doctor's or optometrist's supervision and control, he was practicing neither optometry nor medicine." (Headnotes ¶¶ 1 and 2.)

We cannot discover any material difference between our statute and the Mississippi statute. Likewise, the statement of the facts in *Chester* are similar, if not identical, to our facts.

In *High v. Ridgeway's Opticians*, 258 N. C. 626, 129 S. E. 2d 301, the State Board of Examiners in Optometry for North Carolina brought suit against the defendant optician alleging the optician was practicing optometry in fitting contact lenses.

In North Carolina, both the optometrists and opticians were licensed; however, neither of the licensing statutes directly referred to the fitting of contact lenses. The court observed:

"We think it is apparent from an examination of our statutes defining the practice of optometry and the business of a dispensing optician that the General Assembly has not expressly authorized either the optometrist or the optician to fit contact lenses to the human eye, but that the general terms of the statutes governing both are broad enough to authorize the optometrist to do so and to authorize the dispensing optician to do so upon prescription of a physician, oculist or optometrist." (p. 629.)

The practice of optometry under the North Carolina statutes (G. S. 90-114) is defined as:

". . . the employment of any means, other than the use of drugs, medicines, or surgery, for the measurement of the powers of vision and the adaptation of lenses for the aid thereof; . . ." (p. 627.)

This definition is similar to the definition of optometry under the Kansas optometry law; yet the North Carolina Supreme Court specifically held this statute did not prevent an optician from fitting contact lenses.

One of the important factors considered in the *Ridgeway* opinion was the fact that the optician did nothing insofar as determining power of the human eye, and conducted no tests or examinations to determine the refractive power of the human eye. Thus, although the defendant in *Ridgeway* was fitting contact lenses, he was found not to be engaged in "the adaptation of lenses" to the human eye.

The court also held that the use of the keratometer was merely technical or mechanical and stated:

"A keratometer (or ophthalmometer) is a mechanical instrument or device used for measuring the curvature of the cornea of the human eye. As we

interpret the evidence, its use has no relation whatever to the methods used by medical doctors, oculists or optometrists in the measuring of the powers of vision. . . ." (p. 630.)

Finally, the court held that the fitting of contact lenses by opticians did not constitute the practice of optometry under the North Carolina statutes there involved. The court said:

". . . In our opinion, so long as the dispensing optician fabricates, fits and inserts contact lenses in the eyes in accordance with the prescriptions of examining physicians or oculists, and requires the patient to return to the examining physician or oculist in order that the writer of the prescription may determine whether or not the prescription has been properly filled and the contact lenses properly measured, fabricated and fitted, such optician is not engaged in the practice of optometry within the meaning of the statute." (p. 631).

Plaintiffs contend *Ridgeway* is distinguishable in that dispensing opticians were licensed in North Carolina, and by statute they were authorized to "measure, adapt, fit and adjust lenses." The fact the defendant was licensed was not given any significance in the court's opinion. The effect of the quoted statute was not discussed in the opinion.

In *State ex rel Reed v. Kuzirian*, 228 Or. 619, 365 P. 2d 1046, 88 A. L. R. 2d 1284 (1961), the court held:

"The evidence does show that defendant may have had a proper function to fulfill when he assisted the doctor in fitting contact lenses within the actual personal supervision of the professional person. That does not mean by telephone or written communication but by direct personal supervision. The modification of the decree urged by the plaintiffs would deprive defendant of that function when it might be requested of him by the doctor. We think the decree should be amended so as to read: That except when acting under direct personal supervision of legally qualified personnel, the defendant is enjoined and prohibited from:

"'(a) Measuring portions of the cornea of any persons whatsoever, and based upon such measurement and his judgment, determining what he deems to be the appropriate size and curvature of contact lenses suitable for use by said person.'" (p. 628.)

The Oregon statute defining the practice of optometry is basically the same as K. S. A. 65-1501. The evidence in this case revealed that there was no fixed pattern as to the division of responsibility between the various doctors and the defendant optician. The Oregon court held, under these circumstances, there should be a more direct personal supervision of this particular optician.

In *Ketring v. Sturges*, 372 S. W. 2d 104 (Mo. 1963), the court held that the plaintiffs, who filed an action for a declaratory judgment,

were engaged in the practice of optometry. The case was tried on an agreed statement of facts on which the court commented:

"One difficulty with appellants' position that these functions are purely mechanical arises from the agreed statement of facts in the case. As above set out, appellants have agreed that the measurement of the cornea for contact lenses is not a purely mechanical function. They agree that it also involves the exercise of judgment. Likewise, the stipulation regarding the problems and factors involved in the fitting and adjustment of contact lenses shows that these procedures are not purely mechanical." (pp. 111, 112.)

The factual determinations by the trial court in this case are contrary to the agreed statement in *Ketring;* therefore, its value as a precedent is questionable.

In *Fields v. District of Columbia,* 232 A. 2d 300 (Dist. Col. Ct. App. 1967), the defendant was charged with unlicensed practice of optometry and after conviction he appealed. The fitting process, as related in the opinion, appears to be the same as in this case. The court reviewed all the optometry cases cited herein and said:

". . . Even assuming that the keratometer is a measuring and not a diagnostic instrument, appellant went beyond simple measurement of the patient's eyes and requesting of lenses on the bases of those measurements. It was at this point that he began to adapt lenses to her eyes. Judgments had to be made for the fit of the lenses beyond the areas measured by the instrument; changes were made in their base curvatures for the purpose of fit; changes were made in their powers as based upon his deviations from the instrument's exact readings; the sizes and optical zones of the lenses had to be judged; and the placing of curves in the lenses for the purpose of comfort (not power) had to be determined. Further, appellant inserted a colored dye into the eyes to observe tear patterns and thereby the position and effect of the lenses upon the eyes. Changes in the lenses would be based upon such observations. Without repeating the entire procedure by which appellant fitted the patient's lenses, it is clear that this involved areas of judgment and skill necessary to the adaptation of lenses within the meaning of our optometry statute.

. . . . . . . . . . . . . .

"The wording and purpose of our optometry statute convince us that the fitting of contact lenses by the appellant was the adaptation of lenses within the meaning of that provision. Appellant's contention that he would have referred the patient back to the prescribing doctor does not excuse his practice of optometry at the time of fitting." (pp. 304, 306.)

The specific acts of the defendants which the plaintiffs contend constitute a violation of the statutory definition of optometry are as follows:

1. They determine the correct lens prescription and in so doing they determine the refractive error in the eye.

2. They make examinations to determine the pathological condition of the eye.

3. They adapt lenses to the eye.

The trial court made findings of fact contrary to the plaintiffs' contentions. We believe, however, that on these points the findings were actually conclusions of law. As conclusions of law they are reviewable on appeal limited only by the findings of the trial court specifically identifiable as fact. (*McMichael v. Land Co.*, 104 Kan. 778, 180 Pac. 777.)

We first consider whether the defendants prescribe lenses to correct refractive errors. Refraction is the deviation of light passing obliquely from one medium to another of different density. As this relates to the human eye it is the process by which light rays come to focus on the retina. A "refraction," optometrically speaking, is taken to determine if such a focusing does take place and, if it does not, the "refraction" reveals the degree of error.

The historic function of the optometrist was refracting the human eye to determine the refractive error, if any, and to prescribe or adapt a lens to correct that error. Refraction, as herein explained, is not the function of the defendants. Refraction is solely determined by the physician in the prescription delivered to the defendants. The prescription used by the defendants in ordering contact lenses does not determine refractive error in the eyes except as determined by physicians and as modified by the use of charts and formulae approved by the physicians for use by defendants.

Plaintiffs argue that since defendants must determine the base curve, this affects the amount of tears under the contact lens which in turn may affect the power. Defendants maintain they do not take into consideration any power generated by the lacrimal lens, and there is substantial evidence to support the finding of the trial court to this effect.

Plaintiffs contend the defendants examine eyes for pathological conditions. This argument is based upon the use of the fluorescein pattern test. Although this test may result in disclosing pathological conditions of the eye, such as stippling, dimpling, or abrasion, the basic purpose of the test is to determine the fit; particularly, whether or not the contact lens is floating on the cornea or is touching the cornea. If, in the process of testing the fit by the use of this test, abnormal conditions are discovered, the patient is

directed back to his physician. The pathological conditions are the responsibility of the physician, not the defendants.

Finally, plaintiffs contend that the defendants in the fitting process are "adapting" lenses to the human eye. Plaintiffs argue that the three criteria of a good fit are: (1) That lenses provide good vision, (2) that they fit comfortably, and (3) that they cause no damage, and that defendants resolve at least two of the three. Defendants strive to provide lenses that fit comfortably and cause no damage. In one sense, this could be construed to mean "adaptation" as used in the statute. The statute, however, is aimed at correcting "defects or abnormal conditions" by use of lenses. The use of the word "adaptation" must be construed in connection with the intent of the statute. In this light, "adaptation" does not refer to the fitting process, but to the correction of refractive errors caused by "defects or abnormal conditions." These are the responsibility of the physician. The defendants do not "adapt" the lenses by determining that certain optical qualities are needed to correct refractive error.

The use of technicians to assist medical doctors is a long-standing practice. Nurses, nurses' aides, physical therapists, X-ray technicians, laboratory technicians, prosthesis technicians, and fitters of artificial eyes are examples of the use of ancillary technicians. The right of referral by physicians is recognized by K. S. A. 65-2872 (g).

We conclude, as a matter of law, that the acts of the defendants in the contact lens fitting process, do not result in determining refractive errors, or in examining eyes for pathological conditions, or in adapting lenses within the meaning of the statutes of this state.

Our construction of the optometry statutes with reference to the contentions made by the plaintiffs is in accord with the reasoning in *Chester* and *Ridgeway*. Our conclusions, in harmony with these decisions, are influenced by the similarity of the facts and statutes involved in each of these cases with the facts and statutes involved in this case. Notwithstanding the fact we have approved and followed the rationale of *Chester* and *Ridgeway*, we cannot say these cases establish a "weight of authority" in view of the limited judicial expressions. We realize our conclusions are contrary to the *Fields* case. We are also in conflict with the *Ketring* case and the *Kuzirian* case, although we have pointed out distinguishing features in these two cases.

Dr. Gsell, Dr. Lemoine, Dr. Howard, and Dr. Warren each testified that they considered the patient to be their responsibility throughout the fitting process. We consider this testimony a factor in support of our conclusions beyond the reasoning in *Chester* and *Ridgeway*.

The determination of the issues herein is limited to the activities of these particular defendants as factually found by the trial court. The status of other dispensing opticians as to their compliance with the optometry laws of this state must be determined on an individual basis.

The judgment is affirmed.