No. 47,100

In the Matter of Victor L. Copeland, Victor L. Copeland, *Appellant*, v. Kansas State Board of Examiners in Optometry, *Appellee*, and Committee on Grievance, Kansas Optometric Association, *Appellee*.

(518 P. 2d 377)

Opinion filed January 26, 1974.

*Don C. Smith*, of Mitchell, Smith & Patton of Dodge City, argued the cause, and *John A. Bausch*, of Topeka, was with him on the brief for the appellant.

*Larry L. Luttjohann*, of Topeka, argued the cause and was on the brief for the appellee, Kansas State Board of Examiners in Optometry.

*Glenn J. Shanahan*, of Bryant, Cundiff & Shanahan, of Wichita, was on the brief for the appellee, Committee on Grievance, Kansas Optometric Association.

The opinion of the court was delivered by

Owsley, J.: The trial court, pursuant to appeal under K. S. A. 60-2101 (*a*), sustained an order of the Kansas State Board of Examiners in Optometry revoking the certificate and license of Dr. Victor L. Copeland to practice optometry in the State of Kansas. The trial court's journal entry of judgment stated:

"The Court further finds that appellate review by the District Court under the provisions of K. S. A. 60-2101 (*a*) is restricted to considering from the record whether, as a matter of law, the administrative tribunal, being, in this case, the Kansas State Board of Examiners in Optometry, acted fraudulently, arbitrarily, or capriciously; and whether the order made by said Board is substantially supported by evidence; and further whether said Board acted within the scope of its authority. The Court further finds that under the provisions of K. S. A. 74-1501 to 74-1504, inclusive, and amendments thereto, the examining, licensing and revoking of the license to practice optometry is vested in the Kansas State Board of Examiners in Optometry, and that the

Kansas State Board of Examiners in Optometry has been and is classified as an administrative body.

"The Court further finds from the record and the findings of fact and conclusions of the Board that the Court cannot say or find as a matter of law that there was arbitrary, capricious, or unlawful action taken by said Board. The Court further finds that it cannot say or find that the findings and conclusions by the Kansas State Board of Examiners in Optometry are not supported by substantial evidence. The Court further finds that judgment should be entered in favor of the Kansas State Board of Examiners in Optometry and complainants and against the appellant, Dr. Victor L. Copeland. The Court further finds that its order of May 14, 1970, restraining the Board from forfeiting the certificate of registration and license of Dr. Victor L. Copeland to practice optometry pending the final hearing of this appeal and cause should be dissolved and set aside."

On appeal to this court, Copeland attacks the trial court's judgment on four grounds; namely:

I. The trial court erred in its construction of K. S. A. 60-2101.

II. The trial court's judgment was arbitrary, capricious and unreasonable.

III. The trial court erred in finding the order revoking the license was supported by substantial competent evidence.

IV. The trial court erred in finding the Board did not deny the appellant due process in the hearing procedure.

In support of Point I, Copeland claims a proper construction of K. S. A. 60-2101 (a) permits a trial de novo in the district court. He contends the statute was intended to be quite broad as opposed to specific appeal statutes such as K. S. A. 65-2848 (State Board of Healing Arts), K. S. A. 66-118c (Corporation Commission), K. S. A. 65-1121 (State Board of Health), K. S. A. 65-1628 (State Board of Pharmacy), K. S. A. 65-1450 (State Board of Dental Examiners), and K. S. A. 65-504 (State Board of Health). He further argues that our decisions in *Lauber v. Firemen's Relief Association*, 202 Kan. 564, 451 P. 2d 488, and *Neeley v. Board of Trustees, Policemen's & Firemen's Retirement System*, 205 Kan. 780, 473 P. 2d 72, limiting the scope of appellate review of administrative orders on appeal to the district court, are erroneous in that we failed to give effect to that part of 60-2101 (a) which provides the district court shall "enter such order as justice requires." He contends this phrase is also found in K. S. A. 1972 Supp. 44-556, the Workmen's Compensation appeal statute, and we have construed that statute to permit a trial de novo in district court. He apparently believes administrative actions appealed pursuant to similarly worded appeal

statutes are similar acts and deserve similar review on appeal. Since *Gawith v. Gage's Plumbing & Heating Co., Inc.,* 206 Kan. 169, 476 P. 2d 966, a Workmen's Compensation appeal, adopted the rationale that the function of the Workmen's Compensation Director is judicial and the office is classified as a "quasi-judicial" agency, Copeland asserts the action of the Board in revoking his license is judicial. He then directs our attention to our definition of "quasi-judicial" in *Thompson v. Amis,* 208 Kan. 658, 493 P. 2d 1259:

". . . [Q]uasi-judicial is a term applied to administrative boards or officers empowered to investigate facts, weigh evidence, draw conclusions as a basis for official actions, and exercise discretion of judicial nature." (p. 663.)

He concludes since the record discloses in this case that the Board investigated facts, weighed evidence, drew conclusions, and exercised discretion of a judicial nature, the rule permitting a trial de novo as set forth in *Gawith* should be applied in this action. This argument has no merit. Copeland fails to recognize the point in *Gawith* which was determinative:

". . . When courts are confronted with the problem of determining whether an administrative agency performs legislative or judicial functions, they rely on certain tests to aid in classifying the agency's functions. One such test is whether the court could have been charged in the first instance with the responsibility of making the decisions the administrative agency must make. Another test is whether the function the administrative agency performs is one that courts historically have been accustomed to perform and had performed prior to the creation of the administrative body." (p. 178.)

Historically, the function performed by the Director is one which the courts performed prior to passage of the Workmen's Compensation Act, thus fulfilling the quoted test. The legislature may impose a function upon the courts that is clearly judicial, but by reason of the separation of powers doctrine the legislature cannot impose a legislative function upon the judiciary. (*Jenkins v. Newman Memorial County Hospital,* 212 Kan. 92, 510 P. 2d 132.) The judicial nature of the functions of the Workmen's Compensation Director is clearly distinguishable from the functions of the Optometry Board relating to the licensing of optometrists. This court has previously spoken on the subject and declared the business of licensing to be an administrative function. (*Marks v. Frantz,* 183 Kan. 47, 325 P. 2d 368; *Lira v. Billings,* 196 Kan. 726, 414 P. 2d 13; *Kansas State Board of Healing Arts v. Foote,* 200 Kan. 447, 436 P. 2d 828.) We can best dispose of Copeland's argument for trial de novo by reference to the rule stated in *Marks:*

"The true test of the validity of an order of an administrative body, such as the optometry board, revoking a license to practice the profession in this state, is whether the findings of the board are supported by competent and substantial evidence, and, further, whether, in view of all of the facts and circumstances of the case, the order of revocation is unreasonable, arbitrary or oppressive." (Syl. ¶ 4.)

Copeland contends in Point II that the procedure and conduct of his hearing was arbitrary, capricious and unreasonable and makes several arguments. He contends a fair trial could not result because of the manner of nomination and appointment of members of the Optometry Board. This argument is without merit. The duty to administer and enforce the optometry laws of this state and to regulate the practice of the profession of optometry is cast upon the Kansas Board of Examiners in Optometry. (K. S. A. 74-1501 to 74-1504.) The legislature has provided such restrictive powers of appointment in many instances and the legislative direction as to the manner of appointment to the Optometry Board has been found to be constitutional. (*Marks v. Frantz,* supra.)

Copeland further argues the concern of the grievance committee of the Kansas Optometric Association, who filed the complaint against him, was his threat to the economics of the profession rather than professional ethics and such a concern provides a basis for claiming the action of the Board was arbitrary or capricious. The issue in this proceeding is one of ethics as set forth by the statutes and if violations are supported by evidence the economic overtones are immaterial.

Copeland claims he had no opportunity to prepare a defense. This argument is not supported by the record. We have examined the "Notice of Complaint and Hearing" and find it sets forth in reasonable detail the nature of the charges. The record also reveals Copeland had due notice of all hearings, and participated in and was represented by counsel in a full and complete hearing on the issues. A continuance was granted for two months during which time Copeland and his counsel were afforded an opportunity to investigate, take depositions, and prepare his evidence for presentation to the Board.

Copeland further contends the punishment or penalty exceeds the violation and this, in and of itself, is indicia of an abuse of discretion by an administrative body. He concedes he failed to inform the Board that he spent a day a week serving the optometry needs of the people in Greensburg, Kansas, that he allowed his name to be

used in a Bank Americard ad, and that he claimed expertise in his advertisement announcing his new building. He admits these were violations of statutory requirements and professional ethics, but claims they do not deserve revocation of his life's work. Even if we conclude the Board's action was unduly severe we cannot substitute our judgment for that of the Board. In order to sustain Copeland's position we would be required to say the violations were *de minimis* or insignificant. This we cannot do in view of the record before us.

Copeland asserts as Point III the trial court erred in finding the order revoking his license was supported by substantial competent evidence. The findings and conclusions of the trial court will be more understandable if we point out the distinction between dispensing opticians, who are not required to be licensed, and optometrists, who are required to be licensed. Dispensing opticians, generally speaking, grind lenses and fit glasses to a patient's eyes. Optometrists, who are sometimes referred to as refracting opticians, determine the amount of power correction needed by a patient's eyes. This distinction was fully discussed in *State, ex rel., v. Doolin & Shaw*, 209 Kan. 244, 497 P. 2d 138.

The Board found the appellant violated certain statutes (K. S. A. 65-1504, 65-1506, 65-1510) and regulatory provisions by practicing optometry under a false or assumed name, or as a representative or agent of persons or firms unlicensed to practice optometry in Kansas; by practicing optometry in an unethical manner and in association and conjunction with and as the agent or representative of a corporation unlicensed to practice optometry; by participating, assisting or associating in acts and conduct with persons or organizations unlicensed to practice optometry; by engaging in an arrangement, scheme or plan in subterfuge with unlicensed persons or corporations to practice optometry; by employing or using persons or firms as "cappers" or "steerers" to obtain business and by having arrangements with unlicensed persons or optical dispensers to solicit patronage and for referral of patients; by advertising through arrangements with unlicensed persons and firms in violation of statutes and regulations; by claiming superiority in some form over other optometrical practitioners and by advertising professional superiority; and by offering gratuitous services, premiums, or other inducements.

The foregoing conclusions were supported by extensive findings of fact. Briefly summarized, they are as follows:

Appellant Copeland commenced the practice of optometry in August, 1967, at 2010 Central in Dodge City in the building of another optometrist. He left this location and opened his office for the practice of optometry in his own building, called Doctors' Building, at 2405 Central in Dodge City on or about May 30, 1969.

Copeland arranged for the construction of the Doctors' Building. A lease option agreement was entered into on February 21, 1969, between Robert Coffin, doing business as J-A-G Construction Company, and Copeland, to build the office building. Construction started in March, 1969, and was completed in the latter part of May, 1969.

Terence W. Deatherage, a sales representative for Jayhawk Optical Service in Wichita, visited with Copeland in April, 1969, in Dodge City. Copeland told him he was moving into a new building he was having built and showed him the building. Deatherage also visited with Copeland in May, 1969, at the new building while installing new equipment purchased from him by Copeland. Copeland told him he was going to put a dispensary in the back of the building, where he had previously said that an insurance company would be located. He told Deatherage that Clark Showalter was going to open the dispensary for him. At that time Showalter was employed by Jayhawk Optical Service in Wichita. Copeland stated that the business would be incorporated; that Showalter was going to be running it; that he was going to give Showalter a percentage of the profits; that the business was going to be called Great American Optical; and that it would be opening and doing business on June 1, 1969. Copeland also told Deatherage that Great American Optical was going to offer quick or one-day service and was going to have eyewear at all prices from $12.90 or $14.90 up to $100.00. He stated a lot of business had been going to Garden City because fast service was offered and that he was going to have this dispensary offer fast service and glasses for all prices. Deatherage returned to the lab in Wichita and talked with Showalter, who expressed enthusiasm about coming to work in Dodge City to run the dispensary for 5% of the profits and a salary of $150.00 per week, which would be raised in ninety days or six months to $200.00 per week. Copeland found a house for him in Dodge City. Showalter had no experience in contact lenses, but was going to learn how to manufacture them.

Copeland subsequently talked by telephone with Deatherage in

June, 1969, and asked him if Mr. McEntire, part owner and manager of Jayhawk Optical Service, was angry with him because of Showalter's leaving and going to work for him. Showalter gave notice to McEntire in May, 1969, stating he was going to leave because he had received an offer to go into the dispensing business with Copeland; that he was going to Dodge City to open the dispensary; that he was to receive a percentage of the profits; that Copeland had engaged him and that the dispensary would be separate from Copeland's office; that they were seeking outside prescriptions; that they were going to advertise for the purpose of trying to lure business back from Garden City; and that there would be price advertising and they were going to specialize in contact lenses. McEntire stated that Showalter had no knowledge of fitting or manufacturing contact lenses.

Dr. Chris Breitenbach, a dentist, subleased office space from Copeland in the Doctors' Building. Breitenbach claimed Great American Optical Company, Inc., was his business and that he had obligations in connection with the optical company; however, the dentist was not a director, he was not one of the original incorporators, and he did not know the extent of the financial obligations of Great American Optical.

The initial capital with which Great American Optical commenced business was borrowed by J. Frank Copeland and Jean Copeland, parents of the appellant, from First State Bank in Mullinville, Kansas. A note for $5,000.00 was signed by J. Frank Copeland as President and Jean Copeland as Vice President of Great American Optical, with a personal guaranty signed by J. Frank Copeland. Great American Optical also had its checking account at the First State Bank in Mullinville. Although the Copelands signed the $5,000.00 note, dated May 31, 1969, as President and Vice President of Great American Optical, on May 27, 1969, Dr. Breitenbach signed a signature card for Great American Optical as President and Showalter signed as Vice President. J. Frank Copeland and Jean Copeland were listed on the Articles of Incorporation as incorporators of Great American Optical, along with Showalter.

The evidence clearly indicated Showalter was hired by Copeland for the purpose of starting a dispensary or optical company in Dodge City. Copeland himself stated this to Deatherage, the former employer of Showalter.

Advertising by Great American Optical started on Memorial Day

weekend in 1969 at the same time Copeland moved and opened his office in the new building. Copeland had prior knowledge of this advertising. There was advertising on radio, on television, and in the newspapers. There were ads in connection with Copeland's new building and ads by Great American Optical advertising contact lenses at $69.95.

In connection with the opening of his new office in the Doctors' Building, Copeland sent many persons a letter. It was written for and signed by him and mailed from his office. The letter stated in part:

"It is with extreme pleasure that we announce the opening of our new office, the Doctors' Building, at 2405 Central. . . .

"Our needs for additional facilities and more complete testing equipment have led us to construct this new building. We are proud to say that it is the most complete optometric office in Southwest Kansas.

"Besides the optometric office, the Doctors' Building will house the Great American Optical Company. They will be offering the same-day-service for both glasses and contact lenses. Both the optical company and our office will carry a very complete stock of frames.

. · · · · · · · · · · · · ·

". . . And of special interest to the children patients, a certificate for a free ice cream cone will be waiting following the examination.

". . . And we would like to offer, at no charge, to clean your glasses with our new ultra-sonic cleaner."

Both Copeland and Great American Optical advertised contact lenses, but only Copeland had the knowledge necessary to serve contact lenses customers.

Evidence and testimony of patients clearly indicated there was an arrangement for referral of patients by Great American Optical to Copeland and vice versa.

The purported lease agreement between Great American Optical and Robert Coffin and the arrangements of the parties were created, designed and effected to hide only the most superficial aspects of Great American Optical's participation in the optometric practice of Copeland. Under the lease arrangement and the manner and method of doing business, there was such control, association and joint participation by the parties that Copeland was, in effect, an agent, employee or representative of Great American Optical. The purported lease agreement and arrangements, under the circumstances and in view of the transactions which took place, were merely a subterfuge for the agency which existed between the parties.

The grounds for revocation of a certificate or license to practice optometry in Kansas are set forth in K. S. A. 65-1506. Among the statutory grounds for revocation is subsection (*n*), which provides revocation may be had for violation of any of the provisions of the optometry act. K. S. A. 65-1504, 65-1504a, and 65-1510 also set forth unlawful acts, and violation of these statutory provisions constitutes grounds for revocation under the provisions of K. S. A. 65-1506 (*n*).

Rules and regulations, and a code of ethics have been promulgated by the State Board of Examiners in Optometry pursuant to provisions of K. S. A. 74-1504 (*h*). They include sections and provisions for the conduct and government of licensed and registered optometrists, and they also include sections that prescribe a code of ethics for optometrists practicing within this state which are not inconsistent with the provisions of the optometry act or law. In its Decision and Order, the Board found Copeland had violated various optometry statutes of Kansas and had also violated sections of the rules and regulations and code of ethics promulgated by the Board.

Our consideration and review of the testimony, exhibits and evidence of the hearing before the Board, as contained in the record, discloses the findings and conclusions of the Board were supported by substantial competent evidence and there is no merit in Copeland's appeal on this point.

Point IV on the appeal claims an absence of due process in the hearing procedure. We have previously pointed out that notice was given to Copeland detailing the nature of the charges. Notice was also given as to the hearings held and an opportunity was afforded Copeland to present evidence. The fundamental requisite of due process is notice and an opportunity for a full and complete hearing. (*Carrigg v. Anderson,* 167 Kan. 238, 205 P. 2d 1004.)

Copeland does not claim this basic concept of due process was denied him, but asserts other actions by the Board denied him due process. He contends the legal adviser to the State Board made decisions for the Board and acted in the capacity of a prosecuting attorney in the examination and cross-examination of witnesses produced by the appellant. Although he did not participate in that manner when the association presented its evidence, Copeland contends this same attorney was present during the Board's deliberation sessions.

Assuming the factual statements to be correct, we cannot conclude therefrom that the Board acted in bad faith or permitted

the legal adviser to substitute his judgment for that of the Board. Use of legal personnel is a problem facing all administrative agencies. Many agencies have employed counsel to assist in fulfilling their functions and sometimes counsel is requested to investigate and present matters before the agency. Unless it is shown that the Board permitted actions of counsel which prevented a fair hearing or permitted counsel to participate in the decision-making process of the Board, due process was not denied.

Complaint is also made that the procedure for discipline of attorneys provides for the determination of punishment by this court, a right not provided to the appellant. The legislative pattern has been to provide authority for each profession to govern itself insofar as possible. Since attorneys are officers of the court, disciplinary rules and procedures are determined by the court. The situation of the optometrists is not analogous to that of attorneys, and Copeland's argument is without merit.

Copeland next complains due process was denied in that the decision of the Board was made by two members who were not present at the first hearing. This contention must be denied in view of our recent decision in *Clairborne v. Coffeyville Memorial Hospital*, 212 Kan. 315, 510 P. 2d 1200. We held:

"An administrative decision is not invalid merely because, due to a change in personnel because of illness, death, resignation, transfers or similar reasons, an officer who was not present when the evidence was taken, made or participated in the decision, provided he has considered and acts upon the evidence received in his absence." (Syl. ¶ 1.)

Judgment is affirmed.