No. 98,691

STATE OF KANSAS *ex rel.* PAUL J. MORRISON, Attorney General of the State of Kansas, *Petitioner*, v. THE HONORABLE KATHLEEN SEBELIUS, Governor of the State of Kansas, *Respondent*.

(179 P.3d 366)

Opinion filed March 11, 2008.

*Stephen R. McAllister*, solicitor general, argued the cause, and *Jared S. Maag*, deputy solicitor general, *Kristafer R. Ailslieger*, assistant solicitor general, and *Paul J. Morrison*, attorney general, were with him on the briefs for petitioner.

*Jay P. Warren*, of Bryan Cave LLP, of New York, New York, argued the cause, and *Lynn S. McCreary* and *Kristi K. Wilhelmy*, of Bryan Cave LLP, of Kansas City, Missouri, were on the briefs for respondent.

*Megan E. Jennings*, of Kansas City, Missouri, was on the brief for *amicus curiae* Representative Raj Goyle and Representative Jeff Whitham.

The opinion of the court was delivered by

LUCKERT, J.: During the 2007 Kansas legislative session, the legislature passed and the governor signed House Substitute for Senate Bill No. 244 (H. Sub. S.B. 244), which substantially amended K.S.A. 21-4015 (Furse 1995), formerly known as the Kansas Funeral Picketing Act, and now, as amended, known as the

Kansas Funeral Privacy Act, K.S.A. 21-4015. L. 2007, ch. 111, secs. 1-6. Although the legislature repealed the Kansas Funeral Picketing Act, it did not make operative those substantive provisions of the Kansas Funeral Privacy Act regulating the time and place of protests at funerals. Rather, in a section the parties refer to as the judicial trigger provision, the legislature provided that the funeral protest provisions of the new legislation would not become operative unless and until this court or a federal court determined the funeral protest provisions were constitutional. K.S.A. 21-4015(i). In another provision, referred to as the judicial review provision, the legislature directed the attorney general to file a lawsuit challenging the constitutionality of the funeral protest provisions. K.S.A. 2007 Supp. 75-702a.

This lawsuit is not the action suggested in those provisions, however. In this action, the attorney general challenges the constitutionality of the judicial trigger provision, arguing the legislature violated the separation of powers doctrine by directing the attorney general to file the lawsuit contemplated in the provision. This argument is constructed on two premises. First, according to the attorney general, the legislature usurped or intruded into executive and judicial powers by ordering the attorney general to file a lawsuit he believes would seek an unconstitutional remedy and, as a result, would lack merit. Second, the attorney general's conclusion regarding the merits of the suit is based upon an argument that the judicial trigger lawsuit would require a court to provide advice to the legislature as to whether the funeral protest provisions are constitutional and should become operative; he notes that courts do not have the judicial power to provide advisory opinions. If we agree with the attorney general on these points, he requests an order severing the judicial trigger provision from the Kansas Funeral Privacy Act.

These arguments are partially persuasive. The separation of powers doctrine prohibits the legislature from directing the attorney general to file a lawsuit that would seek an unconstitutional remedy, and the judgment sought by the judicial trigger provision would exceed the constitutionally defined power of a court, which is limited to deciding actual cases or controversies. The funeral

protest provisions cannot present an actual case or controversy because the provisions are inoperative; therefore, no one's privacy has been protected, no one's protest has been restricted, no one's liberty has been threatened, and no one's duty to enforce the provisions has been activated.

Nevertheless, the judicial trigger provision cannot be severed from the Kansas Funeral Privacy Act because severance would broaden the effect of the Act in a manner contrary to the express directions of the legislature. The legislature directed that the funeral protest provisions would become operative if and when determined constitutional. That determination has not been made, and it would violate the separation of powers doctrine to make the provisions operative in a manner contrary to the explicit directions of the legislature.

### Quo Warranto Jurisdiction

Article 3, § 3 of the Kansas Constitution grants this court original jurisdiction in quo warranto actions. Quo warranto is an extraordinary remedy available when "any person shall usurp, intrude into or unlawfully hold or exercise any public office." K.S.A. 60-1202(1). In other words, a writ of quo warranto may issue when it is alleged that the separation of powers doctrine has been violated. A violation of the separation of powers doctrine can result when legislation permits one branch of government to usurp or intrude into the powers of another branch of government. If such a situation exists, the statute is unconstitutional. See, *e.g.*, *State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, 64, 687 P.2d 622 (1984) (statute allowing legislature to adopt, modify, or revoke administrative rules and regulations by concurrent resolution was unconstitutional usurpation of executive powers).

In this case, the governor does not dispute this court's jurisdiction, the appropriateness of this dispute being raised in a quo warranto action, or the appropriateness of this issue being decided on relation of the attorney general against the governor of the state (see *Kansas House of Representatives*, 236 Kan. at 58). Moreover, the governor does not dispute the premise that a statute would be unconstitutional if it ordered the attorney general to seek a remedy,

such as an advisory opinion, that was not within the power of a court.

What the governor does dispute is the attorney general's contention that the judicial trigger and review provisions would lead to an advisory opinion. The governor asserts that a controversy exists currently, meaning that resolution of the controversy would be within constitutionally granted judicial powers, and, consequently, the legislature has the power to direct the attorney general to file the lawsuit testing the Kansas Funeral Privacy Act's constitutionality.

To explain and analyze the parties' differing positions we will examine the statutory provisions; analyze the separation of powers doctrine as it relates to the interrelationship of the legislative, executive, and judicial branches; and apply those principles to the question of whether the legislature's directive to the attorney general violates the separation of powers doctrine.

### Statutory Provisions

In arguing a present controversy exists, the governor's argument is based, in part, upon section 6 of the Kansas Funeral Privacy Act, which provides the Act shall "take effect and be in force from and after its publication in the statute book." L. 2007, ch. 111, sec. 6.

The impact of this provision is diluted by the so-called judicial trigger, which makes some of the Act's provisions inoperative. The judicial trigger provision states:

"(i) Amendments by this act to this section *shall be applicable* on and after whichever of the following dates is applicable:

(1) If the action authorized by K.S.A. 2007 Supp. 75-702a, and amendments thereto, is decided in Kansas state court, amendments by this act to this section shall be applicable from and after the date the Kansas supreme court upholds the constitutionality thereof.

(2) If the action authorized by K.S.A. 2007 Supp. 75-702a, and amendments thereto, is decided in federal court, amendments by this act to this section shall be applicable from and after the date of the judgment of the court upholding the constitutionality thereof." (Emphasis added.) K.S.A. 21-4015(i).

Among the provisions that are not operative because of the judicial trigger are those which make it unlawful to demonstrate "at any public location within 150 feet of any entrance to a cemetery,

church, mortuary, or other location where a funeral is held or conducted, within one hour prior to the scheduled commencement of a funeral, during a funeral or within two hours following the completion of a funeral" or to interfere with a funeral procession or anyone's ability to exit or enter a funeral. K.S.A. 21-4015(e).

However, the judicial trigger does not cover section 2 of the Act, codified at K.S.A. 2007 Supp. 60-1803, which relates to libel and slander occurring at a funeral. Thus, section 2 is operative and, in this regard, stands alone as the only operative, substantive provision.

All other operative provisions are procedural, including section 4, codified at K.S.A. 2007 Supp. 60-2102a(b)(2), which relates to appellate jurisdiction; section 5, L. 2007, ch. 111, which repeals the previous Kansas Funeral Picketing Act; and section 3, codified at K.S.A. 2007 Supp. 75-702a, which provides for judicial review of the substantive provisions. Section 3 states:

> "In accordance with K.S.A. 75-702, and amendments thereto, the attorney general shall seek judicial determination of the constitutionality of K.S.A. 21-4015, as amended by L. 2007, ch. 111, § 1, and amendments thereto. If the action authorized by this section is brought in a district court of this state, then the judgment of that district court shall be appealed directly to the Kansas supreme court as a matter of right." K.S.A. 2007 Supp. 75-702a.

The combined effect of sections 1(i), 3, and 6, L. 2007, ch. 111, is that the attorney general is under a current statutory obligation to challenge the constitutionality of the Kansas Funeral Privacy Act. This obligation creates a current controversy regarding whether the legislature's directive violates the separation of powers doctrine.

### Separation of Powers Doctrine

The separation of powers doctrine is not expressly stated in either the United States or Kansas Constitutions. Yet, the doctrine is recognized as "an inherent and integral element of the republican form of government." *Van Sickle v. Shanahan*, 212 Kan. 426, 447, 511 P.2d 223 (1973). In *Van Sickle*, this court discussed the theoretical underpinnings of the doctrine and its importance to our government, describing it as the "cornerstone to free republican

government" and essential to liberty. 212 Kan. at 445; see also *Leek v. Theis*, 217 Kan. 784, 804-05, 539 P.2d 304 (1975).

The basic contours of the separation of powers doctrine are easily stated. Each of the three branches of our government—the legislative, judicial, and executive branches—is given the powers and functions appropriate to it. As the United States Supreme Court explained nearly 200 years ago: "The difference between the departments undoubtedly is, that the legislature makes, the executive executes, and the judiciary construes the law." *Wayman v. Southard*, 23 U.S. (10 Wheat) 1, 46, 6 L. Ed. 253 (1825).

This statement, while accurate and straightforward, is deceptively simplistic because "separation of powers of government has never existed in pure form except in political theory." *Leek*, 217 Kan. at 805. In reality, there is an overlap and blending of functions, resulting in complementary activity by the different branches that makes absolute separation of powers impossible. *Kansas House of Representatives*, 236 Kan. at 59; see *Youngstown Co. v. Sawyer*, 343 U.S. 579, 635, 96 L. Ed. 1153, 72 S. Ct. 863 (1952) (Jackson, J., concurring) ("While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity."). This recognition has been described as a "pragmatic, flexible and practical approach" to the operation of government. *State v. Greenlee*, 228 Kan. 712, 715, 620 P.2d 1132 (1980).

Given that the separation of powers is not pure, how is it determined that one branch has violated the doctrine by unconstitutionally usurping or intruding into the powers of another branch? Guidance for that determination has been reduced to four general principles. See *State v. Beard*, 274 Kan. 181, 186, 49 P.3d 492 (2002); *Kansas House of Representatives*, 236 Kan. at 59-60; *Manhattan Bldgs., Inc. v. Hurley*, 231 Kan. 20, 32, 643 P.2d 87 (1982); *Greenlee*, 228 Kan. at 716.

First, the separation of powers doctrine requires a court to presume a statute to be constitutional. *Beard*, 274 Kan. at 186. "A statute is presumed constitutional and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a

statute as constitutionally valid, the court must do so." *Martin v. Kansas Dept. of Revenue*, 285 Kan. 625, 629, 176 P.3d 938 (2008).

Second, when considering if there has been a violation of the separation of powers doctrine, a court must examine the specific facts and circumstances presented and search for a usurpation by one branch of government of the powers of another branch of government. *Beard*, 274 Kan. at 186.

Third, a usurpation of powers exists when there is a significant interference by one branch of government with the operations of another branch. 274 Kan. at 186.

Fourth, a court determining whether there has been a significant interference by one branch of government should consider "(a) the essential nature of the power being exercised; (b) the degree of control by one [branch] over another; (c) the objective sought to be attained . . . ; and (d) the practical result of the blending of powers as shown by actual experience over a period of time." *Greenlee*, 228 Kan. at 716 (citing *State ex rel. Schneider v. Bennett*, 219 Kan. 285, 547 P.2d 786 [1976]).

As we apply these principles to this case, we begin with a presumption that the judicial trigger and review provisions are constitutional. Next, we must examine the powers of each branch in the context of the issues before this court. First, is there a significant usurpation or intrusion into the powers of the attorney general and the courts through the legislative directive to file a judicial trigger lawsuit which the attorney general believes lacks merit? Second, does the judicial trigger provision purport to make either a federal court or this court an advisor to the legislature on whether inoperative funeral protest provisions are facially constitutional and, therefore, should be allowed to become operative?

## Legislative Directive to File Suit

Regarding the essential nature of the power of the attorney general and of the legislature with respect to the attorney general, the Kansas Constitution designates the attorney general as an executive officer in Article 1, § 1. The Kansas Constitution does not define the attorney general's duties, however. In the absence of constitutional definition of powers, the legislature has the power to de-

fine the attorney general's duties. *State ex rel. Stephan v. Finney,* 251 Kan. 559, 578, 836 P.2d 1169 (1992) (" '[T]he executive power is more limited than legislative powers, extending merely to the details of carrying into effect laws enacted by the legislature . . . , the legislature having the power, except where limited by the constitution itself, to stipulate what actions executive officers shall or shall not perform.' ").

In defining the attorney general's duties, the legislature obligated the attorney general to "give his or her opinion in writing, without fee, upon all questions of law submitted to him or her by the legislature, or either branch thereof." K.S.A. 75-704. This power is consistent with the long-held view that the giving of advisory opinions is an executive, not a judicial, power. *Tex. Ass'n of Business v. Air Control Bd.,* 852 S.W.2d 440, 444 n.6 (Tex. 1993) (citing *Correspondence of the Justices,* Letter from Chief Justice John Jay and the Associate Justices to President George Washington, August 8, 1793, in Tribe, American Constitutional Law, p. 73 n.3 [2d ed. 1988]); see *Kansas House of Representatives,* 236 Kan. at 70 (Herd, J., dissenting) (positing that court had issued advisory opinion that intruded upon attorney general's duty to advise).

The legislative record regarding the Kansas Funeral Privacy Act reveals the attorney general advised the legislature regarding the constitutionality of the Act and, consistent with his argument before this court, opined the funeral protest provisions are laudable, important, and constitutional. Minutes, House Comm. on Fed. & State Affairs, March 8, 2007 (testimony of Attorney General Paul J. Morrison, attachment 4). The legislature apparently wanted a second opinion and directed the attorney general to seek that opinion by filing the judicial trigger lawsuit. See *In re Advisory Opinion to Governor,* 856 A.2d 320, 323 (R.I. 2004) (in exercising constitutional power granted by Rhode Island Constitution to issue advisory opinion, court cautions the justices are "speaking in our individual capacities as legal experts rather than Supreme Court justices" and that "this opinion is not an exercise of judicial power, it is not binding and it carries no mandate").

Additionally, the legislature imposed a duty upon the attorney general to file and defend lawsuits involving the State when di-

rected to do so by the legislature or the governor. The duty is imposed by K.S.A. 2007 Supp. 75-702, which states:

"The attorney general shall appear for the state, and prosecute and defend all actions and proceedings, civil or criminal, in the supreme court, in which the state shall be interested or a party, and shall also, when required by the governor or either branch of the legislature, appear for the state and prosecute or defend, in any other court or before any officer, in any cause or matter, civil or criminal, in which this state may be a party or interested or when the constitutionality of any law of this state is at issue and when so directed shall seek final resolution of such issue in the supreme court of the state of Kansas."

This provision is not under attack in this suit. Nor does the attorney general argue the judicial review provision in the Kansas Funeral Privacy Act, which draws authority from K.S.A. 2007 Supp. 75-702, is unconstitutional by itself. Rather, he argues the unconstitutionality arises when the judicial review provision of the Kansas Funeral Privacy Act is combined with the judicial trigger provision, because the result is a directive from the legislature requiring the attorney general to take action contrary to the Kansas Constitution and, therefore, lacking merit.

The first premise of this argument—that the legislature cannot constitutionally direct the attorney general to take an action the attorney general believes is without merit—is supported by *State ex rel. Foster v. City of Kansas City*, 186 Kan. 190, 350 P.2d 37 (1960). *State ex rel. Foster* was an original quo warranto proceeding filed by the State, on relation of the county attorney, to test the validity of ordinances annexing an industrial district to the City of Kansas City. The attorney general intervened and filed a motion to dismiss the action. The following month, the governor directed the attorney general not to seek the dismissal of the proceeding but to prosecute it and assure all parties an opportunity to present the issues.

The principal issues on appeal were whether the attorney general had authority to intervene in a suit brought by the county attorney and, having done so, whether the attorney general had the right to file a motion to have the action dismissed when dismissal was contrary to the instructions of the governor. The court ruled the governor did not have the power to prevent the attorney gen-

eral from pursuing the motion to dismiss if the attorney general, acting as an attorney and, therefore, as an officer of the court, felt the action lacked merit. Even though the directive came from one member of the executive branch to another, the court found a violation of the separation of powers because the attorney general, in that capacity, acted as an officer of the court:

"[W]e conclude the attorney general by his motion to intervene and supersede the county attorney exercised his powers and duties under the constitution and appropriate statutes; this was as far as he could go as an executive officer and as an attorney and officer of this court. Since he is an officer of the judicial branch, under the separation of powers of the three branches of government, he was limited and restricted in his conduct before this court by the code of professional ethics [citation omitted] to the same extent any other lawyer would be. If, therefore, the attorney general considered the action unmeritorious, he not only had the authority, but he also had a duty to move for dismissal. We cannot think that the framers of our state constitution or the members of the legislature ever intended that the governor should have control over the judicial branch, or its officers, as is advocated [by the defendant]. Each of the three branches of our government should be zealous of its jurisdiction and each should also be vigilant to see that it does not encroach upon the jurisdiction of the other two." 186 Kan. at 197.

These conclusions control the first issue in this case; the legislature, like the governor, lacks constitutional authority to intrude into the attorney general's duties as an officer of the court. The legislature cannot override an attorney's ethical duties to not "bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law." Kansas Rules of Professional Conduct (KRPC) 3.1 (2007 Kan. Ct. R. Annot. 500) (meritorious claims and contentions); see K.S.A. 60-211(b)(2), (c) (signing petition certifies good faith belief that claims are meritorious; sanctions provided for violations). Moreover, the attorney general is duty bound to uphold the constitution. K.S.A. 54-106 (oath of office shall be taken by all officers elected or appointed under any law of the State of Kansas to support the Constitution of the United States and the Constitution of the State of Kansas and to faithfully discharge all duties of office). Consequently, the legislature cannot direct the attorney

general to file an action if the attorney general has a good faith belief that the action seeks an unconstitutional remedy.

The attorney general does not suggest this conclusion ends our analysis. Nor does he argue his conclusion regarding the merits of a judicial trigger action should not be tested. Indeed, the point of this action is to seek an adjudication that an action attacking the inoperative Kansas Funeral Privacy Act's funeral protest provisions would necessarily seek a remedy that is constitutionally prohibited—*i.e.*, an advisory opinion.

### Legislative Directive for An Advisory Opinion

Unquestionably, courts have the power to determine whether a statute is constitutional. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803); *State ex rel. Slusher v. City of Leavenworth*, 285 Kan. 438, 443, 172 P.3d 1154 (2007). This power arises, however, only when the question is presented in an actual case or controversy between parties; courts do not have the power to issue advisory opinions. *Muskrat v. United States*, 219 U.S. 346, 361-62, 55 L. Ed. 246, 31 S. Ct. 250 (1911); *NEA-Topeka, Inc. v. U.S.D. No. 501*, 227 Kan. 529, 531-21, 608 P.2d 920 (1980).

As the United States Supreme Court explained in *Muskrat*, which is often cited as the classic case stating the rule against advisory opinions:

"In [*Marbury v. Madison*] Chief Justice Marshall, who spoke for the court, was careful to point out that the right to declare an act of Congress unconstitutional could only be exercised when a proper case between opposing parties was submitted for judicial determination; that there was no general veto power in the court upon the legislation of Congress; and that the authority to declare an act unconstitutional sprang from the requirement that the court, in administering the law and pronouncing judgment between the parties to a case, and choosing between the requirements of the fundamental law established by the people and embodied in the Constitution and an act of the agents of the people, acting under authority of the Constitution, should enforce the Constitution as the supreme law of the land." 219 U.S. at 357-58.

Kansas courts have followed the same rule as federal courts. See, e.g., *Sheila A. v. Finney*, 253 Kan. 793, 796, 861 P.2d 120 (1993); *NEA-Topeka, Inc.*, 227 Kan. at 531; *Knowles v. State Board of Education*, 219 Kan. 271, 278, 547 P.2d 699 (1976); *Thompson v.*

*Kansas City Power & Light Co.*, 208 Kan. 869, 871, 494 P.2d 1092, *cert. denied* 409 U.S. 944 (1976); see also *Hill v. Prince Hall Grand Lodge*, 183 Kan. 148, 151, 325 P.2d 334 (1958) (describing *Muskrat* as "the classical, old case on the question of justiciable controversy").

Advisory Opinions and Federal Separation of Powers

The prohibition against advisory opinions is imposed by the United States and Kansas Constitutions. Article III, § 1 of the United States Constitution invests the "Judicial Power" in the courts, and § 2 expressly limits the power to "Cases" or "Controversies." The United States Supreme Court has explained that the "Cases" or "Controversies" provision in Article III limits the judicial power to resolving disputes that were "traditionally amenable to, and resolved by, the judicial process" in those cases that could be adjudicated at common law. *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 774, 146 L. Ed. 2d 836, 120 S. Ct. 1858 (2000) (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 102, 140 L. Ed. 2d 210, 118 S. Ct. 1003 [1998]); see also *Honig v. Doe*, 484 U.S. 305, 340, 98 L. Ed. 2d 686, 108 S. Ct. 592 (1988) (Scalia, J., dissenting) (stating that the terms "The Judicial Power," "Cases," and "Controversies" have "virtually no meaning except by reference" to "the traditional, fundamental limitations upon the powers of common-law courts"); *Coleman v. Miller*, 307 U.S. 433, 460, 83 L. Ed. 1385, 59 S. Ct. 972 (1939) ("Judicial power could come into play only in matters that were the traditional concern of the courts at Westminster and only if they arose in ways that to the expert feel of lawyers constituted 'Cases' or 'Controversies.' ").

The constitutional terms—judicial power, case, and controversy—"define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government." *Flast v. Cohen*, 392 U.S. 83, 95, 20 L. Ed. 2d 947, 88 S. Ct. 1942 (1968). The United States Supreme Court explained the relationship by quoting a speech John Marshall made in the House of Representatives:

"'A case in law or equity, . . . was a term . . . of limited signification. It was a controversy between parties which had taken a shape for judicial decision. If the judicial power extended to every question under the constitution it would involve almost every subject proper for legislative discussion and decision; if to every question under the laws and treaties of the United States it would involve almost every subject on which the executive could act. The division of power [among the branches of government] could exist no longer, and the other departments would be swallowed up by the judiciary.' 4 Papers of John Marshall 95 (C. Cullen ed. 1984)." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341, 164 L. Ed. 2d 589, 126 S. Ct. 1854 (2006).

See *Valley Forge Christian College v. Americans United*, 454 U.S. 464, 474, 70 L. Ed. 2d 700, 102 S. Ct. 752 (1982).

In fact, the Supreme Court emphasized that " '[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.' " *Raines v. Byrd*, 521 U.S. 811, 818, 138 L. Ed. 2d 849, 117 S. Ct. 2312 (1997) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 37, 48 L. Ed. 2d 450, 96 S. Ct. 1917 [1976]).

Recently, the United States Supreme Court has admitted its decisions, especially those where a party seeks a declaratory judgment, have not drawn "the brightest of lines" delineating which actions satisfy the Article III case-or-controversy requirement. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 166 L. Ed. 2d 604, 127 S. Ct. 764 (2007). Four standards were identified to assure this requirement was satisfied: (1) the dispute must be " 'definite and concrete' "; (2) the dispute must touch " 'the legal relations of parties having adverse legal interests' "; (3) the dispute must "be 'real and substantial,' " which in the declaratory judgment context would mean the controversy was " 'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment' "; and (4) the dispute must " 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' [Citations omitted.]" 549 U.S. at 127.

As this indicates, the antithesis of a justiciable controversy—*i.e.*, those having definite and concrete issues arising between parties with adverse legal interests that are immediate, real, and amenable

to conclusive relief—is a case seeking an advisory opinion. Advisory opinions lack factual context, precise legal issues, truly adverse parties, and do not result in a binding judgment:

"Such [advisory] opinions, such advance expressions of legal judgment upon issues which remain unfocused because they are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaceted situation embracing conflicting and demanding interests, we have consistently refused to give. [Citations omitted.]" *United States v. Fruehauf*, 365 U.S. 146, 157, 5 L. Ed. 2d 476, 81 S. Ct. 547 (1961).

To enforce the case-or-controversy requirement, assure the four standards are met, and assure that federal courts do not provide advisory opinions, the United States Supreme Court has imposed requirements broadly incorporated into and labeled as "justiciability" and has emphasized that these requirements are essential to federal courts abiding by the separation of powers doctrine. *DaimlerChrysler Corp.*, 547 U.S. at 341-42; *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 11-12, 159 L. Ed. 2d 98, 124 S. Ct. 2301 (2004); *Diamond v. Charles*, 476 U.S. 54, 61-62, 90 L. Ed. 2d 48, 106 S. Ct. 1697 (1986); *Valley Forge Christian College*, 454 U.S. at 471-74; *Warth v. Seldin*, 422 U.S. 490, 498, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975); see Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U.L. Rev. 881, 897-98 (1983).

The justiciability doctrine requires a plaintiff to have standing and to present only issues that are ripe for decision, that are not moot, and that do not present a political question. *DaimlerChrysler Corp.*, 547 U.S. 332 (doctrines of standing, mootness, ripeness, and political question all originate in Article III's "case" or "controversy" language); *Allen v. Wright*, 468 U.S. 737, 750, 82 L. Ed. 2d 556, 104 S. Ct. 3315 (1984) (justiciability includes doctrines of standing, ripeness, and mootness).

Were the attorney general to attempt to meet these requirements in federal court, it is unlikely there would be questions regarding whether the issues he presented were moot or presented a political question. But serious questions would arise regarding

whether the issues were ripe and whether the attorney general had standing to bring the suit.

The doctrine of ripeness is "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.' " *National Park Hospitality Ass'n v. Department of Interior*, 538 U.S. 803, 807, 155 L. Ed. 2d 1017, 123 S. Ct. 2026 (2003). To be ripe, issues must have taken shape and be concrete rather than hypothetical and abstract. *Public Service Comm'n v. Wycoff Co.*, 344 U.S. 237, 244, 97 L. Ed. 291, 73 S. Ct. 236 (1952). Stated yet another way, the doctrine prevents courts from being "asked to decide 'ill-defined controversies over constitutional issues,' [citation omitted], or a case which is of 'a hypothetical or abstract character.' [Citation omitted.]" *Flast*, 392 U.S. at 100.

The issues presented in the judicial trigger suit contemplated by the Act would be hypothetical, essentially asking: If the provisions were being enforced, would they infringe on any constitutional right? The parties and the court would speculate on what rights an aggrieved party might assert as having been violated, and those issues would be considered in the abstract without actual facts to inform the court's analysis and resolution of the questions.

The second justiciability requirement implicated by the judicial trigger suit is standing. Standing is often capsulized as requiring an injury in fact. The standing doctrine has other implications, however, as explained by the United States Supreme Court:

"[O]ur standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement [citation omitted,] and prudential standing, which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction,' [citation omitted]. The Article III limitations are familiar: The plaintiff must show that the conduct of which he complains has caused him to suffer an 'injury in fact' that a favorable judgment will redress. [Citation omitted.] Although we have not exhaustively defined the prudential dimensions of the standing doctrine, we have explained that prudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.' [Citations omitted.]" *Elk Grove Unified School Dist.*, 542 U.S. at 11-12.

Applying these requirements to the judicial trigger lawsuit, the governor conceded at oral argument that, at a minimum, the attorney general would not be able to prove injury in fact and would, therefore, lack standing to bring a suit in federal court. We, therefore, conclude the lawsuit contemplated by the judicial trigger provision, K.S.A. 21-4015(i), would not satisfy federal standards used to determine whether an actual case or controversy exists and under federal law would be considered a provision calling for an impermissible advisory opinion from the courts.

Advisory Opinions and Kansas Separation of Powers

Despite Kansas' earlier adherence to the rule of *Muskrat,* application of the federal principles does not automatically lead to the conclusion that the Act's judicial trigger could not be activated in Kansas. State courts are not bound by the prohibition against advisory opinions found in the Constitution of the United States or by federal justiciability requirements. The United States Constitution's prohibition arises solely from Article III. 1 Rotunda & Nowak, Treatise on Constitutional Law: Substance and Procedure § 2.13 (4th ed. 2007); see also, *e.g., Allen,* 468 U.S. at 750 (federal courts are confined to adjudicating actual cases or controversies); *Qwest Corp. v. Public Utilities Comm'n of Colorado,* 479 F.3d 1184, 1191 (10th Cir. 2007) (Article III of federal Constitution bars federal courts from issuing advisory opinions.). Neither the terms of Article III nor the Due Process Clause makes that Article applicable to the states. *Asarco Inc. v. Kadish,* 490 U.S. 605, 617, 104 L. Ed. 2d 696, 109 S. Ct. 2037 (1989) ("the constraints of Article III do not apply to state courts"); see also U.S. Const., Amend. X (reserving powers "not delegated to the United States by the Constitution" to the states).

Hence, each state is free to define the judicial powers of its courts. Speaking generally, most state constitutions, including our Kansas Constitution, vary from the Constitution of the United States in three substantive ways that affect judicial power: (1) the inherent remedial role of state courts differs because of the nature of rights accorded by state constitutions; (2) jurisdiction of state courts differs from that of federal courts; and (3) the text of the

judicial article in state constitutions often does not refer to the necessity of cases or controversies.

First, regarding the difference in the inherent remedial powers of the courts, the distinction arises because the Constitution of the United States grants what are referred to as negative rights—*i.e.*, rights which the government may not infringe. If a court finds an·· infringement of such a right—whether the infringement arises from an unconstitutional statute or through the actions of a government official—the remedy is to stop the infringement by striking the offending statute, prohibiting and punishing the action, and suppressing fruits obtained from the unconstitutional act. See *Harris v. McRae*, 448 U.S. 297, 318, 65 L. Ed. 2d 784, 100 S. Ct. 2671 (1980); *Jackson v. City of Joliet*, 715 F.2d 1200, 1203 (7th Cir. 1983); Herschkoff, *State Courts and the "Passive Virtues": Rethinking the Judicial Function*, 114 Harv. L. Rev. 1833, 1890 (2001).

Similarly, state constitutions, including Kansas', grant negative rights, and judicial remedies for violations of those rights are consistent with remedies allowed in federal courts. The difference in the inherent remedial power of state courts arises because all state constitutions also grant positive rights, *i.e.*, rights that entitle individuals to benefits or actions by the state. Herschkoff, *Positive Rights and States Constitutions: The Limits of Federal Rationality Review*, 112 Harv. L. Rev. 1131, 1135 (1999) ("Unlike the Federal Constitution, every state constitution in the United States addresses social and economic concerns, and provides the basis for a variety of positive claims against the government."); see, *e.g., Montoy v. State*, 278 Kan. 769, 771, 120 P.3d 306 (2005) (Article 6, § 6 of the Kansas Constitution requires legislature to "make suitable provision for finance" of the public schools.). When a positive right has been violated, the typical remedy imposed for protecting negative rights—prohibiting government action—exacerbates the problem that arose when the government failed to act and fulfill its duties. To enforce a positive right, courts must mandate a positive remedy by requiring the state government to act and thereby fulfill the constitutional right. See *Montoy v. State*, 279 Kan. 817,

828, 112 P.3d 923 (2005); Herschkoff, 114 Harv. L. Rev. at 1890-91.

The second substantive difference between judicial power provisions in state constitutions and the provisions in the Constitution of the United States is found in the delineation of jurisdiction. Each state is free to determine the jurisdictional limits of its courts in any respect not preempted by federal jurisdiction. 1 Rotunda & Nowak, Treatise on Constitutional Law § 2.13. State constitutions contain unique jurisdictional features. For example, Article 3, § 3 of the Kansas Constitution grants this court original jurisdiction of this and similar quo warranto actions and mandamus actions. (Compare United States Constitution, Article III, held in *Marbury v. Madison*, 5 U.S. [1 Cranch] 137, to grant United States Supreme Court appellate jurisdiction in mandamus.)

The Kansas Constitution's jurisdictional provisions do not vary from those in the United States Constitution as drastically as other states' constitutions. Several states have explicitly empowered state courts to give advisory opinions. Kansas is not one of those jurisdictions. See 1 Rotunda & Nowak, Treatise on Constitutional Law § 2.13, p. 247 n.3 (listing states allowing advisory opinions); Herschkoff, 114 Harv. L. Rev. at 1845-46 (discussing history, cases, and differences between United States and state Constitutions); Topf, *State Supreme Court Advisory Opinions as Illegitimate Judicial Review*, 2001 L. Rev. Mich. St. U. Det. C.L. 101 (Spring 2001) (same; discussing history of provisions in 10 states); Topf, *The Jurisprudence of the Advisory Opinion Process in Rhode Island*, 2 Roger Williams U. L. Rev. 207, 254-56 (1997) (same; including text of constitutional provisions); see also, *e.g.*, *Smith v. Martens*, 279 Kan. 242, 244, 106 P.3d 28 (2005) (general rule is that appellate court does not decide moot questions or render advisory opinions).

The final distinction between the provisions regarding judicial power in the United States and Kansas Constitutions is a difference in how the judicial power is phrased. Article 3, § 1 of the Kansas Constitution grants the "judicial power" exclusively to the courts just as Article III, § 1 of the United States Constitution establishes the separation of powers parameter in the federal government.

But, Article 3 of the Kansas Constitution, like parallel provisions of many other state constitutions, does not include the "case" or "controversy" language found in Article III, § 2 of the United States Constitution.

Nevertheless, Kansas courts have repeatedly recognized that the "judicial power" is the "power to hear, consider and determine controversies between rival litigants." *State, ex rel., v. Mohler*, 98 Kan. 465, 471, 158 Pac. 408 (1916), *aff'd* 248 U.S. 112, 63 L. Ed. 153, 39 S. Ct. 32 (1918); see *In re M.R.*, 272 Kan. 1335, 1339, 38 P.3d 694 (2002) (" ' "It is the duty of the courts to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions." ' "); *State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./ Kansas City*, 264 Kan. 293, 337, 955 P.2d 1136 (1998) (judicial power is the " 'power to hear, consider and determine controversies between rival litigants' "); *U.S.D. No. 380 v. McMillen*, 252 Kan. 451, Syl. ¶ 5, 845 P.2d 676 (1993) ("[t]he judiciary interprets, explains, and applies the law to controversies"); see Dorf, *The Relevance of Federal Norms for State Separation of Powers*, 4 Roger Williams U. L. Rev. 51, 61 (1998) (positing that "the state court shares with the federal court the limitations that flow from its status as a court").

In recognizing a constitutional case-or-controversy requirement, Kansas courts have relied solely on the separation of powers doctrine embodied in the Kansas constitutional framework. *NEA-Topeka, Inc.*, 227 Kan. at 531-32.

As part of the Kansas case-or-controversy requirement, courts require: (a) parties must have standing; (b) issues cannot be moot; (c) issues must be ripe, having taken fixed and final shape rather than remaining nebulous and contingent; and (d) issues cannot present a political question. See *State v. Snow*, 282 Kan. 323, 343, 144 P.3d 729 (2006) (standing); *Martens*, 279 Kan. at 244-45 (mootness); *Department of Revenue v. Dow Chemical Co.*, 231 Kan. 37, 41, 642 P.2d 104 (1982) (quoting *Public Service Comm'n*, 344 U.S. at 243-44 (ripeness); *Van Sickle v. Shanahan*, 212 Kan. 426, 438, 511 P.2d 223 (1973) (adopting standards for political questions stated in *Baker v. Carr*, 369 U.S. 186, 210, 217, 7 L. Ed.

2d 663, 82 S. Ct. 691 [1962]). This court has noted the " 'constitutional dimension' " of these requirements which have the effect of requiring all plaintiffs and petitioners to meet the threshold burden of making "out a case or controversy between himself and the defendant." *312 Education Ass'n v. U.S.D. No. 312,* 273 Kan. 875, 882, 47 P.3d 383 (2002) (quoting *Harrison v. Long,* 241 Kan. 174, 176, 734 P.2d 1155, *appeal dismissed* 484 U.S. 804 [1987]).

Like federal decisions, this court's decisions note the policy considerations that underlie the requirement of justiciability and the prohibition against advisory opinions: controversies provide factual context, arguments are sharpened by adversarial positions, and judgments resolve disputes rather than provide mere legal advice. See, *e.g., Kansas Bar Ass'n v. Judges of the Third Judicial Dist.,* 270 Kan. 489, 500-01, 14 P.3d 1154 (2000) (lack of concrete facts); *State ex rel. Stephan v. Kansas House of Representatives,* 236 Kan. 45, 70, 687 P.2d 622 (1984) (Herd, J., dissenting) (lack of adversarial positions means issues are not sharpened); see Note, *"Ghosts That Slay": A Contemporary Look at State Advisory Opinions,* 37 Conn. L. Rev. 1155, 1180-81 (2005) (advisory opinions suffer from abstraction of legal questions and inadequate factual context).

As in federal court, less rigorous requirements have been imposed in declaratory judgment cases; yet, actual cases and controversies are still required. The one Kansas case stressed by the governor at oral arguments in this case is illustrative. In *State ex rel. Hopkins v. Grove,* 109 Kan. 619, 201 Pac. 82 (1921), the constitutionality of Kansas' declaratory judgment statute was challenged on the basis those actions did not present a case or controversy. Rejecting this argument, the court noted a declaratory action involves "two disputants, each of whom sincerely believes in the rightfulness of his own claim" and upon whom the judgment would be binding. 109 Kan. at 623. In contrast, the court noted advisory opinions are based upon abstract questions, are " 'inoperative and nugatory,' " and are " 'merely an opinion, which would remain a dead letter, and without any operation upon the rights of the parties . . . . Such is not the judicial power confided to this Court.' [Citation omitted.]" 109 Kan. at 622, 624.

Thus, despite the differences between our Kansas Constitution and the Constitution of the United States, both limit the judicial power to actual cases and controversies. The judicial power granted by Article 3 of the Kansas Constitution does not include the power to give advisory opinions. A Kansas court issuing an advisory opinion would violate the separation of powers doctrine by exceeding its constitutional authority.

Advisory Opinions Regarding Legislation

The constitutional prohibition against advisory opinions applies to all cases, whether involving legislation or not. See, *e.g., Cady v. Cady*, 224 Kan. 339, 345, 581 P.2d 358 (1978) (postdivorce proceeding holding Kansas courts do not render advisory opinions on abstract questions of law absent actual controversy). Where, as here, the lawsuit would request an opinion regarding the constitutionality of inoperative legislation, an additional separation of powers issue is presented: Does the judicial trigger provision abdicate legislative power by seeking advice regarding the constitutionality of inoperative legislation?

Article 2 of the Kansas Constitution gives the legislature the exclusive power to pass, amend, and repeal statutes. *State ex rel. Stephan v. Finney*, 251 Kan. 559, 577, 836 P.2d 1169 (1992). It is universally recognized that " 'the essential of the legislative function is the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct within the limitations laid down by the constitution.' " 251 Kan. at 578. The separation of powers doctrine, therefore, prohibits either the executive or judicial branches from assuming the role of the legislature. *E.g., State ex rel. Board of Healing Arts v. Beyrle*, 269 Kan. 616, 622, 7 P.3d 1194 (2000); *State ex rel. Tomasic*, 264 Kan. at 337-38.

Broadly speaking, where the legislature looks to the future and changes existing conditions by making a new rule to be applied thereafter, by contrast "the judiciary investigates, declares, and enforces liabilities as they stand on present or past facts, under laws supposed *already to exist*." (Emphasis added.) 16A Am. Jur. 2d, Constitutional Law § 262. Consequently, when the legislature is

considering legislation, a court cannot enjoin the legislature from passing a law. "This is true whether such action by the legislature is in disregard of its clearly imposed constitutional duty or is the enactment of an unconstitutional law." *Kansas House of Representatives,* 236 Kan. at 51.

In addition to preventing courts from interfering during the legislative process, the separation of powers doctrine requires courts to give deference to the legislature's enactments. *E.g., Leek v. Theis,* 217 Kan. 784, 792-93, 539 P.2d 304 (1975). This deference is based upon a recognition that an assessment of constitutionality is inherent in legislative policymaking. See K.S.A. 54-106 (legislators required to take oath of office to uphold constitution). Hence, enacting a statute implies the legislature has made an assessment that the provision is constitutional.

Power is shifted away from the legislature when the legislature does not reach its own independent conclusion, albeit preliminary, regarding the constitutionality of a statute. Frankfurter, *A Note on Advisory Opinions,* 37 Harv. L. Rev. 1002, 1003 (1924). Consequently, the giving of a judicial opinion regarding the constitutionality of pending legislation "violates the principle of separation of powers by facilitating abdication by the legislature of its duty to make a judgment on the constitutionality of a pending statute independent of that made by the justices." Note, *Advisory Opinions on the Constitutionality of Statutes,* 69 Harv. L. Rev. 1302 (1956); see, *e.g., In re Constitutionality of House Bill No. 222,* 262 Ky. 437, 90 S.W.2d 692 (1936); *In Re: Constitutionality of House Bill 88,* 115 Vt. 524, 64 A.2d 169 (1949).

As the Minnesota Supreme Court stated in one of the earliest of such decisions, if the court were to opine on the constitutionality of legislation it would act as "the advisers of the legislature, nothing more." *In the Matter of Application of the Senate,* 10 Minn. 78, 81 (1865); see also *Muskrat v. United States,* 219 U.S. 346, 362, 55 L. Ed. 246, 31 S. Ct. 250 (1911) (determining the validity of legislation would require court "to give opinions in the nature of advice concerning legislative action, a function never conferred upon it by the Constitution, and against the exercise of which this court has steadily set its face from the beginning").

The constitutional concerns were summarized by Professor, later Justice, Frankfurter who warned that by resolving legislative questions without the factual framework of an actual conflict, the judiciary deals with abstract questions that weaken "legislative and popular responsibility" by shifting the policymaking burden away from the legislature, which Frankfurter described as the people's branch of government, and depriving the legislature of its "creative function." Frankfurter, *A Note on Advisory Opinions*, 37 Harv. L. Rev. at 1005, 1007. Additionally, he warned that attempts to "formulate [controversies] in terms of sterile legal questions [are] bound to result in sterile conclusions unrelated to actualities." 37 Harv. L. Rev. at 1003. The need for a factual record and adversarial framing of issues is, in Frankfurter's view, so fundamental and critical to consideration of constitutional questions that "failure scrupulously and persistently to observe these commonplaces jeopardizes the traditional American constitutional system more than all the loose talk about 'usurpation.' " 37 Harv. L. Rev. at 1003.

The fact that the legislature has requested the advice does not cure the constitutional problems. "[A] power or duty forbidden by the Constitution cannot be conferred on the court by the Legislature, and cannot be exercised by the court or its members." *In re Constitutionality of House Bill No. 222*, 262 Ky. at 441. Consistent with this conclusion, Kansas cases, although not addressing the specific circumstance of legislation authorizing advisory opinions, have held that while the legislature may enact laws that confer jurisdiction or impose judicial functions on a court, it cannot impose a legislative or executive function on courts, except for functions relating to court administration. To do so would constitute a violation of the separation of powers doctrine by the legislature because it would be requiring the judicial branch to exercise legislative or executive power. *Copeland v. Kansas State Board of Examiners in Optometry*, 213 Kan. 741, 743, 518 P.2d 377 (1974); *Lira v. Billings*, 196 Kan. 726, 730-31, 414 P.2d 13 (1966).

Moreover, it is widely recognized that such advisory opinions regarding the constitutionality of legislation would have little effect. Such decisions relate to the facial constitutionality of the statute, having little impact if the statute is attacked on an "as applied"

basis, and do not directly affect the rights of nonparties who have a due process right to be heard. See *Advisory Opinion to the Governor*, 196 So. 2d 737, 739 (Fla. 1967).

## Post-*Muskrat* Supreme Court Cases

The governor does not dispute these authorities but suggests a different situation is presented because the attorney general would not be seeking an opinion regarding pending legislation. Rather, the Kansas Funeral Privacy Act will not be further considered by the legislature; once this court renders a decision regarding the constitutionality of the substantive provisions of the Act, those provisions would become operative without further legislative action. Consequently, she suggests this case is more similar to three decisions in which the United States Supreme Court has considered the constitutionality of legislation that is not operative. Citing *South Carolina v. Katzenbach*, 383 U.S. 301, 15 L. Ed. 2d 769, 86 S. Ct. 803 (1966), *Buckley v. Valeo*, 424 U.S. 1, 46 L. Ed. 2d 659, 96 S. Ct. 612 (1976), and *Northern Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 48 L. Ed. 2d 274, 96 S. Ct. 1793 (1976), which she acknowledges are not binding on this court, the governor argues a similar approach would allow a Kansas court to decide whether the substantive provisions of the Kansas Funeral Privacy Act are constitutional.

The attorney general disagrees, suggesting that because the substantive provisions are inoperative the legislature has requested advice on whether the provisions should become operative rather than making that decision as a legislative body. Additionally, the attorney general notes that the governor's arguments ignore the justiciability requirements that are inherent in the constitutional requirements.

We agree with the attorney general on this point. A review of each of the cited cases reveals that the cases involved actual controversies, parties with conflicting positions and a stake in the litigation, and a factual framework for consideration. In contrast, none of these attributes would be present in a suit brought by the attorney general pursuant to the Kansas Funeral Privacy Act's directive.

In *Katzenbach*, the Supreme Court upheld a provision of the Voting Rights Act of 1965 which required states to obtain preclearance of proposed voting rights statutes from the United States Attorney General or from the District Court for the District of Columbia to protect against racial discrimination in voting. 383 U.S. at 320, 337.

The *Katzenbach* Court dismissed the notion that it would be issuing an advisory opinion. Because the Act, which was operative, suspended any new voting regulation, the state or subdivision that enacted a voting regulation had "a concrete and immediate 'controversy' with the Federal Government" in that the states could not implement and enforce otherwise validly enacted voting laws. 383 U.S. at 335.

The Court contrasted the provision, which resulted in an actual controversy, from other provisions of the Voting Rights Act, which had not yet resulted in an actual controversy. South Carolina attacked these additional provisions, but the Court held that absent a showing that any person had been subjected to or threatened with criminal sanctions authorized by the provisions, South Carolina's attack on the provisions was premature. 383 U.S. at 316-17. Thus, the absence of an injury or any threat barred the constitutional attack on those sections. These provisions are most analogous to the suspended provisions of the Kansas Funeral Privacy Act— no person could be prosecuted and, therefore, no actual controversy exists.

The second United States Supreme Court case cited for our consideration is *Buckley*. *Buckley* involved a challenge to the Federal Election Campaign Act of 1971, which limited political campaign contributions and expenditures. The plaintiffs, various candidates for federal office, sought a declaratory judgment and an injunction against enforcement of certain provisions of the Act. The Supreme Court stated: "At the outset we must determine whether the case before us presents a 'case or controversy' within the meaning of Art. III of the Constitution. Congress may not, of course, require this Court to render opinions in matters which are not 'cases or controversies.' " 424 U.S. at 11. The Court found it clear that Congress intended to provide judicial review to the extent

permitted by Article III and that the complaint demonstrated that at least some of the plaintiffs had a sufficient "personal stake" in a determination of the constitutional validity of each of the challenged provisions to present a real and substantial controversy, as opposed to " 'a hypothetical state of facts.' " 424 U.S. at 11-12 (noting prohibition potentially would benefit those plaintiffs who intended to run for office in the 1976 election and whose rights in that campaign would, to a significant degree, be adjudicated by the FEC); see also *Reuss v. Balles*, 584 F.2d 461 (D.C. Cir. 1978) (discussing *Buckley*). Hence, an actual case or controversy existed. In contrast, the challenge to the Kansas Funeral Privacy Act would not involve anyone with a personal stake because no one has a duty to enforce the provision and no one could be prosecuted. Additionally, there would be no factual framework for the decision.

Finally, the 1976 case of *Hollowbreast*, 425 U.S. 649, is cited by the governor. As the governor notes, it is difficult to fully reconcile this case with *Muskrat*, the classic case prohibiting advisory opinions. Yet, the United States Supreme Court did not comment on the obvious parallels.

*Muskrat* related to Congress allotting portions of communally owned land to specified members of the Cherokee Nation. In 1902, Congress passed legislation allotting the land to each living member of the Cherokee Nation born before September 1, 1902. Sometime afterward, the tribal council asked that their children born during a certain period also receive scheduled allotments of land. Congress granted this request and passed legislation in 1904 and 1906 that allowed for this expansion of the class of persons receiving property. This expansion, of course, reduced the share of those members of the class described in the 1902 Act.

Sensing that this situation might pose constitutional problems, Congress enacted additional legislation that gave " 'William Brown and Levi B. Gritts, on their own behalf and on behalf of all other Cherokee citizens' " the right to sue the United States " 'in the court of claims to determine the validity' " of any acts passed after 1902. 219 U.S. at 350 (quoting the 1907 Act). A date was given by which the suits should be filed and provision was made to pay the attorney fees of Brown and Gritts. No other compensation or rem-

edy was provided. Under this Act of Congress, Brown and Gritts filed suit against the United States challenging the constitutionality of the post-1902 allocations.

The Supreme Court ordered that the suit be dismissed for lack of jurisdiction for failure to present a "case" or "controversy" under Article III, § 2 of the United States Constitution. 219 U.S. at 361. The Court determined that the United States had no interest adverse to Brown and Gritts.

"The object is not to assert a property right as against the government, or to demand compensation for alleged wrongs because of action upon its part. The whole purpose of the law is to determine the constitutional validity of this class of legislation. . . . Such judgment will not conclude private parties, when actual litigation brings to court the question of the constitutionality of such legislation. In a legal sense the judgment could not be executed, and amounts in fact to no more than an expression of opinion upon the validity of the acts in question." 219 U.S. at 361-62.

*Hollowbreast* arose under similar circumstances. *Hollowbreast* resulted after Congress amended statutes it had adopted in 1926, relating to allotments of mineral rights to the Northern Cheyenne Tribe. In the 1926 legislation, Congress had provided by statute that mineral rights in the reservation property of the Northern Cheyenne Tribe should remain in the tribe, and after 50 years such rights would pass to the individual allottees of the surface rights or their heirs. In 1968, after the potential value of the mineral rights had appreciated tremendously, Congress passed a new law to reserve the mineral rights in perpetuity for the benefit of the tribe. To avoid liability for damages based upon a potential claim that the 1968 Act violated the allottees' rights under the Just Compensation Clause of the Fifth Amendment to the United States Constitution, Congress conditioned the termination of the allottees' interest in the mineral deposits upon a judicial determination that the 1926 Act did not grant the allottees vested rights to the mineral deposits or the passage of 2 years without a suit resolving the question.

In deciding the Fifth Amendment issue, the *Hollowbreast* Court did not explicitly discuss the question of whether it would be giving an advisory opinion. Perhaps this is explained by the fact the parties

did not raise or discuss the issue on appeal. In fact, the briefs do not cite *Muskrat*. Nor was the issue discussed in the lower court decisions from which the appeal was taken, and the statutory provision that delayed effectiveness of the amendments is mentioned only in passing in the lower court decisions. For example, it is relegated to a footnote in the trial court's opinion. *Northern Cheyenne Tribe v. Hollowbreast*, 349 F. Supp. 1302, 1303 n.1 (D. Mont. 1972), *rev'd Northern Cheyenne Tribe v. Northern Cheyenne, etc.*, 505 F.2d 268 (9th Cir. 1974), *rev'd* 425 U.S. 649 (1976).

Rather, the Supreme Court observed that it "has consistently recognized the wideranging congressional power to alter allotment plans until those plans are executed." 425 U.S. at 655-56. Further, the "extensiveness of this congressional authority, as well as 'Congress' unique obligation toward the Indians,' [citation omitted,] underlies the judicially fashioned canon of construction that these [allotment] statutes are to be read to reserve Congress' powers in the absence of a clear expression by Congress to the contrary." 425 U.S. at 656. Also, the focus of the analysis was the 1926 statute, which was still in effect. After examining the legislative history of the 1926 provisions, the Court concluded it was not Congress' intent to grant individual allottees vested future interests in the mineral deposits underlying the allotted lands. Therefore, the individual allottees did not possess a vested property interest in the mineral deposits, and the 1968 Act did not violate the Just Compensation Clause. 425 U.S. at 658-60.

At least one commentator has suggested that *Muskrat* may have been seriously diluted by *Hollowbreast*, noting that, post-*Hollowbreast*, "advisory opinion traditions do not raise an insurmountable barrier to justiciability." Wright, Miller & Cooper, 13 Federal Practice and Procedure: Jurisdiction 2d § 3529.1, p. 301 (1984).

Yet, although describing the *Hollowbreast* decision as "startling," another commentator notes the case involved identified interests and controversies. Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 282 (1988). In *Hollowbreast* there is no difficulty identifying the nature of the interest of the parties seeking the Supreme Court's judgment. The tribe stood to gain if the legislation was ruled constitutional because the consequence of the statute was to

"revest" the mineral rights in the tribe. The substantive legal interests that the allottees sought to protect did not exist because of the new statute but because of the 1926 statute. Consequently, as pointed out by Professor Fletcher, the tribe would have been able to litigate the substantive question presented, although in a less expeditious way, under existing jurisdictional statutes. 98 Yale L.J. at 282. Simply put, "the only role of the special statute was to confer jurisdiction on the federal courts to hear the cases in an expedited manner." 98 Yale L.J. at 282.

The lack of discussion of the issue of advisory opinions makes the impact of *Hollowbreast* ambiguous at best. Even if we consider the decision as presenting a relaxed reading of the advisory opinion rule, that reading can be reconciled with many of the policies underlying the prohibition against advisory opinions. The conditional termination in *Hollowbreast* was directly tied to the resolution of an actual, concrete dispute, *i.e.*, allottees' claims of vested rights in mineral deposits required the interpretation of an existing law and involved adverse parties with a stake in the outcome.

In contrast, the Kansas Funeral Privacy Act provisions criminalizing funeral protests are not in effect. See K.S.A. 21-4015(e), (i). Additionally, where in *Hollowbreast* the 1926 statute remained in effect and its meaning was at issue in the decision, the Kansas Funeral Privacy Act repealed the Funeral Picketing Act. In other words, there would be no effective statute to consider in the judicial trigger lawsuit, and any arguments regarding the constitutionality of the provision would not be tied to the resolution of an actual dispute; both the governor and the attorney general believe the funeral protest provisions are constitutional. Thus, the litigation would lack adversarial sharpening of issues. Finally, the judgment would not have binding effect of any sort. In these respects, the judicial trigger suit has more similarities with the situation in *Muskrat* than with that in *Hollowbreast.*

Mandamus

Still, the governor argues she would have a sufficient stake in the outcome to justify a *Hollowbreast*-type allowance of the judicial trigger suit. The governor's arguments, particularly her concession

that federal standing requirements cannot be satisfied, imply that standing is the only barrier preventing the judicial trigger lawsuit from being brought in federal court. Further, her arguments suggest the attorney general would have standing in Kansas. Indeed, standing considerations are somewhat different in state court when an action is brought seeking a writ of mandamus.

In this action, the attorney general attempted to invoke mandamus jurisdiction. In his petition, he repeatedly asked that we direct the governor to enforce the funeral protest provisions. On July 25, 2007, the petition for writ of mandamus was denied. We stated:

"A ruling on the appropriateness of enforcement of S.B. 244's substantive provisions is premature. This action is not a section 3 challenge to the authority of the legislature to enact provisions relative to funeral picketing as set forth in section 1. We have no case or controversy before us on that issue. In addition, there is no need for this court or any court to order the governor to enforce the law as passed by the legislature and signed by her. That is her constitutional duty as head of the executive branch, and such law is presumed to be constitutional in the absence of a contrary court ruling."

At this stage of the proceeding, we must determine whether an actual case or controversy would be presented even if a section 3 challenge—*i.e.,* a judicial review lawsuit under K.S.A. 2007 Supp. 75-702a—was filed. The governor's arguments suggest there would be if the suit was filed as a mandamus action seeking to resolve questions about the scope of her duty in enforcing the funeral protest provisions.

K.S.A. 60-801 defines mandamus as "a proceeding to compel some . . . person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law." Thus, mandamus provides the remedy of "compelling a public officer to perform a clearly defined duty, one imposed by law and not involving the exercise of discretion." *Manhattan Buildings, Inc. v. Hurley,* 231 Kan. 20, 26, 643 P.2d 87 (1982). Additionally, "[m]andamus [is] an appropriate avenue to obtain an authoritative interpretation of the law for the guidance of public officials in their administration of public business." *Alpha Med. Clinic v. Anderson,* 280 Kan. 903,

916, 128 P.3d 364 (2006). This power can be invoked when an official has not performed a duty because of questions about whether the duty exists or about the scope of the duty. See, *e.g.,* *State ex rel. Slusher v. City of Leavenworth,* 285 Kan. 438, 172 P.3d 1154 (2007); *Wilson v. Sebelius,* 276 Kan. 87, 72 P.3d 553 (2003).

The governor observes that Article 1, § 3 of the Kansas Constitution provides that "[t]he supreme executive power of this state shall be vested in a governor, who shall be responsible for the enforcement of the laws of this state." Thus, because of her constitutional duty to execute the laws, the governor argues she would have a "substantial stake" in knowing whether she may enforce the criminal provisions regulating funeral protests and, therefore, her rights are affected and she would be entitled to guidance regarding her duties.

The fallacy of this argument is that a law-in-waiting cannot give rise to a present enforcement duty. At the time of the judicial trigger lawsuit, like now, there would be only a possibility of an enforcement duty arising at some unspecified future time. Currently and during a judicial trigger lawsuit, the question of her duty has and would have no more reality than a law school exam question. Even in the broadest reading of our mandamus cases, courts do not have jurisdiction over purely hypothetical questions associated with nonexistent duties.

In reaching this conclusion, we concede, like the United States Supreme Court before us, that our cases in this area have not drawn the brightest of lines for discerning when a case or controversy exists. See, *e.g., State ex rel. Stephan v. Kansas House of Representatives,* 236 Kan. 45, 70, 687 P.2d 622 (1984) (Herd, J., dissenting) (arguing there was no controversy and that majority, citing expediency, had issued advisory opinion and warning such " 'small beginnings' " create the danger of imperceptible " 'but gradual increase into the assumption of governmental power by one department' "); *Stephens v. Van Arsdale,* 227 Kan. 676, 682, 608 P.2d 972 (1980) ("On occasion, this court, when confronted with significant issues of statewide concern, has broadened the availability of mandamus in order to expeditiously resolve the is-

sues."); *State ex rel. Smith v. State Highway Comm.*, 132 Kan. 327, 335, 295 Pac. 986 (1931) ("Our conceptions of the proper use of mandamus to expedite the official business of the state have expanded far beyond the ancient limitations of matters justiciable in mandamus.").

In part, this leniency arises because the standing requirement is less stringent in some actions sounding in mandamus. This is not so when a private person brings an action in mandamus; in such a case, there must be a showing of actual, specific, and peculiar injury. *Kansas Bar Ass'n v. Judges of the Third Judicial Dist.*, 270 Kan. 489, 491, 500-01, 14 P.3d 1154 (2000) (bar association and two licensed attorneys could not show specific injury arising from Small Claims Procedure Act provision that precluded attorneys from representing claimants and allowed representation by individuals who were not licensed attorneys; petition did not state justiciable case or controversy; rather, it "presented as a hypothetical question—an issue which should be addressed upon a concrete set of facts").

When actions are brought on relation of the attorney general or another government officer, however, there is no requirement of actual injury. *Kansas House of Representatives*, 236 Kan. at 53. In such a case, it must be shown: (1) there is a question relating to a specified duty imposed by law and not involving discretion; (2) the question must be of great public importance and concern sufficient to warrant the court exercising its discretionary jurisdiction; and (3) the question must arise from an actual controversy, meaning a situation must have arisen which implicates the official's duty. See K.S.A. 60-801; *Kansas House of Representatives*, 236 Kan. at 53; *State v. Dolley*, 82 Kan. 533, 108 Pac. 846 (1910).

This third requirement was discussed extensively nearly 100 years ago in *Dolley*, 82 Kan. 533, a case in which the attorney general began proceedings in mandamus against the bank commissioner and the state treasurer, alleging they had denied national banks the privilege of participating in the benefits of an act providing for the creation of a depositors' guaranty fund. A motion for abatement was filed, arguing the litigation resulted from collusion

of the parties in an effort to get a court ruling regarding the scope of the act.

The court recognized that the controversy might have been "prompted by a purpose to make what is called a 'test case' " but concluded that "does not defeat jurisdiction." 82 Kan. at 537. A suit filed by an official in order to get a judicial interpretation of a statute rather than to "act upon a doubtful construction of a statute" does not make the action "fictitious, though it may in a sense be 'friendly' " and may have been prompted by the treasurer's desire to obtain guidance on his duties under the statute. 82 Kan. at 537.

The key was that there was an actual controversy. "[T]he court cannot undertake to interpret a statute because doubts exist as to its meaning in advance of a situation having arisen requiring action thereunder. In order for judicial power to be exercised with regard to the statute, there must be an actual and concrete controversy." 82 Kan. at 536.

In concluding its discussion, the court observed that if there were no real controversy there would not be jurisdiction; jurisdiction does not exist where the petitioner

" 'seeks to get a judgment on a pretended controversy, when in reality there is none, or a decision in advance about a right before it has been actually asserted and contested, or a judgment upon some matter, which, when rendered, for any reason, cannot have any practical legal effect upon a then existing controversy.' " 82 Kan. at 537.

There must be " 'an actual, bona fide contest as to a legal right.' " 82 Kan. at 537.

For example, in *State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, the court rejected the argument that no controversy existed and concluded there was an actual contest as to the legislature's legal right to adopt, modify, or revoke administrative rules and regulations by concurrent resolutions without presentment to the governor. The court first noted: "[T]his action does not seek to preclude the legislature from exercising its discretion to enact an unconstitutional law, but rather seeks to stop the legislature from acting under the authority of an unconstitutional enactment." 236 Kan. at 51. Hence, the court concluded a

judgment in the case would not preclude the exercise of legislative discretion but would resolve a present, real controversy over whether the legislature was exercising an executive function. 236 Kan. at 51. Additionally, the court noted that the legislature had done more than pass the authorizing legislation, it had passed concurrent resolutions pursuant to the legislation. As a result, "various agencies and boards affected by the changes in these rules and regulations are unsure of the legal effect and enforceability of such rules and regulations." 236 Kan. at 51.

The court next discussed whether an advisory opinion was being requested through a request for a writ of mandamus in *State ex rel. Stephan v. Finney*, 251 Kan. 559, 836 P.2d 1169 (1992). At issue in that case was whether the governor was authorized to negotiate and enter into binding tribal-state compacts under the Indian Gaming Regulatory Act. The governor had negotiated the compacts and submitted the agreements to the Secretary of the Interior for approval, a step required by law before the compacts could become enforceable. The Secretary of the Interior had given notice that no action would be taken to review the compacts until the lawsuit was resolved. The governor contended the relief sought through mandamus and quo warranto "would constitute only an advisory opinion inasmuch as the tribal-state compact is not an enforceable instrument unless and until it is approved by the Secretary of the Interior." 251 Kan. at 566. Rejecting this contention, the court emphasized that the governor had actually negotiated and executed the contracts. Thus, the acts which gave rise to the contention that the governor had exceeded the constitutional authority of her office had occurred. Also, other tribes were seeking negotiations, and "to those directly involved the matter demands immediate settlement." 251 Kan. at 568.

Again, the attributes of an actual case or controversy that underlie the separation of powers principles and define the judicial power were present in these cases: an actual case existed giving factual context to the issues, adversarial positions were asserted, and issues were real and not hypothetical. The governor has not cited Kansas cases that deviate from these conclusions, although

admittedly the parties' focus was on decisions of the United States Supreme Court and not this court.

In other words, contrary to the governor's argument, satisfying the standing requirement is not all that is necessary to create an actual case or controversy relating to the constitutionality of the funeral protest provisions. Even if the attorney general does not have to show actual injury, he must establish that the issues are ripe and present an actual case or controversy. As long as the funeral protest provisions are inoperative, neither the attorney general nor the governor has a duty to enforce the provisions, and any questions about their duty would not have taken fixed and final shape but would remain hypothetical, nebulous, and contingent. Furthermore, no one would have been required to abide by the funeral protest provisions and, therefore, no rights would have been abridged and no one's privacy would have been protected.

Consequently, we conclude the judicial trigger provision seeks an unconstitutional remedy that would violate the separation of powers doctrine in two respects. First, a lawsuit filed pursuant to the provision would not present an actual case or controversy. It would seek an advisory opinion, and a court would not have the judicial power to grant the remedy. Second, the provision purports to make the Kansas Supreme Court an advisor to the legislature on whether the inoperative funeral protest provisions are facially constitutional and should be allowed to become operative. A court issuing such an opinion would usurp the legislature's duty to make a preliminary judgment on the constitutionality of inoperative legislative provisions.

Hence, we hold the legislature violated the separation of powers doctrine by directing the attorney general to file an action challenging the constitutionality of the funeral protest provisions of the Kansas Funeral Privacy Act.

### Severance

Both the attorney general and the governor suggest that to cure this unconstitutionality we should sever the judicial trigger provision.

On several previous occasions, this court has considered severing a provision from a statute if to do so would make the statute constitutional and the remaining provisions could fulfill the purpose of the statute. Each time, this court has emphasized that the determination of whether the provision may be severed " 'depends on the intent of the legislature.' " *State v. Limon*, 280 Kan. 275, 302, 122 P.3d 22 (2005); see also, *e.g.*, *State v. Carpenter*, 231 Kan. 235, 240-41, 642 P.2d 998 (1982) (striking phrase from statute as unconstitutionally vague); *Gumbhir v. Kansas State Board of Pharmacy*, 228 Kan. 579, 588, 618 P.2d 837 (1980) (striking phrase from statute which unlawfully delegated legislative power). Further, " '[t]his court will assume severability if the unconstitutional part can be severed without doing violence to legislative intent.' " *Thompson v. K.F.B. Ins. Co.*, 252 Kan. 1010, 1023, 850 P.2d 773 (1993) (quoting *Felten Truck Line v. State Board of Tax Appeals*, 183 Kan. 287, 300, 327 P.2d 836 [1958]).

An argument in favor of severability is stronger if an act has a severability clause. Although the decision to strike language does not depend upon the presence of a severance provision, " '[t]he enactment of a severability clause in a statute or series of statutes evidences the intent of the legislature that if some portion or phrase in the statute is unconstitutional, the balance shall be deemed valid.' " *Limon*, 280 Kan. at 304 (quoting *State v. Next Door Cinema Corp.*, 225 Kan. 112, Syl. ¶ 8, 587 P.2d 326 [1978]). The legislation at issue in this case contains a severability clause. K.S.A. 21-4015(h). The severability clause was already in place at the time the legislature approved the 2007 amendments at issue in this case.

Citing these rules, both parties suggest we can sever the judicial trigger provision by relying on the severability clause. Severing that provision, which suspends the operation of the funeral protest provisions, would have the effect of making the funeral protest provisions operative. The parties and amicus suggest this indirect result is consistent with legislative intent and argue that the legislative history reveals the legislature would have passed the Kansas Funeral Privacy Act even without the judicial trigger provision.

To accept this conclusion, we must flip over the specific directive in the judicial trigger provision, which provided that the funeral

protest provisions "shall be applicable on and after . . . the date of the judgment of the court upholding the constitutionality thereof." K.S.A. 21-4015(i). We decline to engage in such judicial gymnastics. "When a statute is plain and unambiguous, we do not attempt to determine what the law should or should not be; nor do we attempt to divine the legislative intent behind it." *Martin v. Kansas Dept. of Revenue*, 285 Kan. 625, 629, 176 P.3d 938 (2008). The suspension and activation clauses in the judicial trigger provision are more specific than the general severability provision, and, through those provisions, the legislature was very clear in stating the only condition under which the provisions would become operative. Having this type of specific directive distinguishes this case from other cases in which a court must employ extrinsic aids—such as determining whether an act can operate without the provision—to discern whether severance would violate legislative intent. *Limon*, 280 Kan. at 302-06; *State v. Denney*, 278 Kan. 643, 659-60, 101 P.3d 1257 (2004). In this case, the Act itself answers the question and tells us that striking the judicial trigger provision would make the funeral protest provisions operative in a manner other than expressly directed by the legislature.

An additional reason not to sever arises from the result that would occur upon severance, *i.e.*, the activation of statutory provisions. Typically, courts do not have authority to decide when legislation becomes operative. Indeed, the decision of if and when legislation shall become effective is an inherently legislative duty. This duty was discussed in *State ex rel. Tomasic*, 264 Kan. at 317-18. The specific question in *State ex rel. Tomasic* was whether the legislature may constitutionally delegate to the voters its legislative power to decide if a law will become effective. In discussing the question, the court distinguished a situation where voters exercise local option provisions and thereby decide to accept a privilege conferred by the legislature, which is constitutional, from a situation where the existence of the legislative provisions was dependent upon the voters' approval, which would be unconstitutional. 264 Kan. at 318-20.

The authorities that are cited to support this conclusion trace back to the leading case of *Barto against Himrod*, 8 N.Y. (4 Selden) 483, 59 Am. Dec. 506 (1853), where the court concluded:

"All the foregoing [constitutional] provisions contemplate that a law receives its vitality from the legislature. The representatives of the people are the law makers, and they are responsible to their constituents for their conduct in that capacity.

. . . .

"The law under consideration is in conflict with the constitution in various respects. Instead of becoming a law by the action of the organs appointed by the constitution for that purpose, it claims to become a law by the vote of the electors; and it claims that the popular vote may make it void and restore the former law. All the safeguards which the constitution has provided are broken down, and the members of the legislature are allowed to evade the responsibility which belongs to their office. . . .

". . . In short, the law was a mere proposition submitted to the people to be adopted or rejected as they pleased.

"If this mode of legislation is permitted and becomes general, it will soon bring to a close the whole system of representative government which has been so justly our pride. The legislature will become an irresponsible cabal, too timid to assume the responsibility of lawgivers, and with just wisdom enough to devise subtile schemes of imposture, to mislead the people. All the checks against improvident legislation will be swept away; and the character of the constitution will be radically changed." 8 N.Y. (4 Selden) at 494-97 (Willard, J.).

These discussions in *State ex rel. Tomasic* and *Barto* occur in the context of the delegation of duties doctrine. See 1 Singer, Sutherland Statutes and Statutory Construction §4:6 (6th ed. 2002) (discussing delegation doctrine as it relates to legislature delegating to the judiciary). The parties did not discuss this doctrine, undoubtedly because both focus on the severability provision. Nevertheless, we cannot ignore implications of the delegation doctrine because both it and the rules relating to severability flow from the separation of powers doctrine and both must be considered to assure this decision does not result in a usurpation of legislative power. See *Blue Cross & Blue Shield of Kansas, Inc. v. Praeger,* 276 Kan. 232, 276, 75 P.3d 226 (2003). The delegation doctrine recognizes the impracticality of pure separation of powers and that a mixture of functions can result, especially in the functioning of an administrative agency where legislative, executive, and judicial powers are often blended together. 276 Kan. at 277. Based upon this recognition, the legislature can delegate, for example, the fashioning of regulations which fill in the details of a statute. 276 Kan. at 278. On occasion, the delegation of duties doctrine has been recognized

as applying when duties are delegated to the judiciary. See *Warren County v. Judges of the Fifth Jud. Dist.*, 243 N.W.2d 894 (Iowa 1976) (judges allowed to determine if full-time magistrate can be substituted for part-time magistrate).

On the other hand, as the discussion in *State ex rel. Tomasic* illustrates, some legislative duties cannot be delegated. See *Praeger*, 276 Kan. at 276 (referring to nondelegation doctrine). And *State ex rel. Tomasic* raises a question as to whether the legislature could delegate to a court the duty to make a legislative provision operative. Although we recognize this question, we need not resolve it in this case because the result is the same whether or not the power can be delegated. Under either circumstance, this court cannot make the funeral protest provisions operative. If the power to decide when a statute is to become operative cannot be delegated, the issue must return to the legislature. On the other hand, if we assume the duty can be delegated, the delegation came with specific directions and those directions must be followed.

Some direction must be given in order for a legislative delegation to be constitutional; the legislature must enact a statute that " 'express[es] the law in general terms and delegate[s] the power to apply it to an executive agency under standards provided by the legislature.' [Citation omitted.]" *Praeger*, 276 Kan. at 277. It follows that the delegated power must be exercised in a manner consistent with the standards expressed in the legislation. See *Wesley Medical Center v. McCain*, 226 Kan. 263, 271, 597 P.2d 1088 (1979) (delegation to administrative agency requires "adequate standards and guide rules"); *State ex rel. Donaldson v. Hines*, 163 Kan. 300, 309, 182 P.2d 865 (1947) (delegation to administrative agency must be guided by "conditions, restrictions, limitations, yardsticks, guides, rules, [or] broad outlines"). Often the issue raised in delegation doctrine cases is the adequacy of the standard; that question does not arise here, however. See *Praeger*, 276 Kan. at 255.

Rather, the judicial trigger provision stated an explicit standard. Even though we have determined the judicial trigger provision is unconstitutional, we cannot ignore its clear statement of legislative direction that the provisions would become operative if and when

this court or a federal court determined the provisions were constitutional. Activation under other circumstances would violate the express statement of the legislature, broaden the scope of the Kansas Funeral Privacy Act in a manner not authorized by the legislature, and violate the separation of powers doctrine. See 2 Singer, Sutherland Statutory Construction § 44.13 (6th ed. 2001).

Therefore, although the attorney general's petition to find K.S.A. 21-4015(i) unconstitutional is granted, the attorney general's request for an order severing K.S.A. 21-4015(i) is denied.

Judgment for the petitioner is granted in part and denied in part.

JOHNSON, J., concurring in part and dissenting in part: I agree that the judicial trigger provision of K.S.A. 21-4015(i) is invalid. However, I would find that the legislature's intent with respect to the severability of that section to be plainly and explicitly stated in K.S.A. 21-4015(h), which provides:

"(h) If any provision of this section or the application thereof to any person or circumstances is held invalid, the invalidity does not affect other provisions or applications of this section which can be given effect without the invalid provisions or application. To this end the provisions of this section are severable."

I perceive that, after invalidating subsection (i), the remaining provisions of the Kansas Funeral Privacy Act contain all that is necessary to effect the intended purpose of the legislation, including the specific provision of section 6, which states: "This act shall take effect and be in force from and after its publication in the statute book." L. 2007, ch. 111, sec. 6. Given the stand-alone character of the remaining provisions of the Act, the expressed legislative intent is for the invalidated subsection (i) to be severed, rather than for the entire Act to be invalidated. I would take the legislature at its word and sever the judicial trigger provision of subsection (i).